**KENNEDY PARK HOMES ASSOCIATION, Incorporated, Colored People's Civic and Political Organization, Inc., James M. Thomas, Samuel Martin, the Diocese of Buffalo, N. Y., Plaintiffs,**

United States of America,
Plaintiff-Intervenor,

v.

**CITY OF LACKAWANNA, Lackawanna, New York, et al., Defendants.**

**Civ. No. 1968–385.**

United States District Court,
W. D. New York.

Aug. 13, 1970.

Will Gibson, Buffalo, N. Y., and Michael Davidson, New York City, for Kennedy Park Homes Association, Inc., Colored People's Civic and Political Organization, James M. Thomas and Samuel Martin.

Kevin Kennedy, Buffalo, N. Y. (Charles S. Desmond, Buffalo, N. Y., of counsel), for the Diocese of Buffalo.

Gerald W. Jones and Stephen P. Passek, Attys., Dept. of Justice, Washington, D. C. (Jerris Leonard, Asst. Atty. Gen. of United States, and H. Kenneth Schroeder, Jr., U. S. Atty., Western District of New York, on the brief), for United States.

Condon, Klocke, Ange & Gervase, Buffalo, N. Y. (John W. Condon, Jr., and Grace Marie Ange, of counsel), Buffalo, N. Y., for defendants.

## DECISION AND ORDER

CURTIN, District Judge.

## COMPLAINTS

On December 2, 1968, Kennedy Park Homes Association, Inc. (hereinafter referred to as K.P.H.A.), Colored People's Civic and Political Organization (hereinafter referred to as C.P.C.P.O.), James M. Thomas and Samuel Martin filed a complaint against the City of Lackawanna, Mayor Mark L. Balen, Director of Development Frank Cipriani, Chief Engineer Edward Kuwik and the then members of the Lackawanna City Council charging violations of the Equal Protection and Due Process Clauses of the Fourteenth Amendment, the Civil Rights Act (42 U.S.C. § 1983), and the Fair Housing Act of 1968 (42 U.S.C. § 3601 et seq.).

The complaint alleges that the Diocese committed itself to sell to K.P.H.A., a non-profit organization formed by the C.P.C.P.O., 30 acres of its approximately 80 acres of vacant land located in Lackawanna's third ward for development of a low income housing subdivision. The two individual plaintiffs allege that they intend to purchase homes in the proposed subdivision.

Plaintiffs contend that certain resolutions amending the City's zoning ordinances to restrict all land referred to therein to the exclusive use as a park and recreation area and declaring a moratorium prohibiting the approval of all future subdivisions were passed in October, 1968 by the City Council for the purpose of denying low income families—whether they are elderly, Negro or Puerto Rican—the equal protection of the laws in obtaining decent housing. The Diocese contends the purpose of these resolutions was to deny it the right to use and dispose of its property.

Among other things, the plaintiffs seek a judgment declaring the defendants' use of the City's zoning and appropriation powers an unconstitutional deprivation of plaintiffs' rights and mandatory relief requiring the defendants to take steps toward the approval of the subdivision. Plaintiffs also seek to enjoin defendants from enforcing the October, 1968 zoning and moratorium ordinances.

On February 5, 1969, this court—the defendants offering no opposition—granted the United States of America

leave to file a complaint in intervention pursuant to Section 902 of the Civil Rights Act (42 U.S.C. § 2000h–2). Plaintiff-Intervenor invokes this court's jurisdiction under Section 813 of the Civil Rights Act of 1968 (42 U.S.C. § 3613).

The allegations in the complaint in intervention are substantially the same as those in the plaintiffs' complaint. In its prayer for relief, the Plaintiff-Intervenor asks the court to enjoin the defendants from engaging in any other acts or practices which have the effect of depriving Negroes of their right to purchase or rent dwellings in Lackawanna without regard to their race or color.

## ANSWERS

The original answer filed January 29, 1969, an amended answer filed February 17, 1969, and the answer to the complaint in intervention filed February 17, 1969 generally deny the allegations of the complaints. The answers also assert five "defenses": (1) Defendants allege that the City desires, and very much needs, a park and that construction of the proposed subdivision in the Martin Road area (the only large and centrally located vacant area left in Lackawanna) would forever foreclose the City's opportunity to have such a park; (2) Defendants allege that the sewers in the Martin Road area are so overloaded that they could not tolerate the additional sewage of a new subdivision; (3) The Diocese of Buffalo has no standing to sue in this action; (4) The complaint fails to state a cause of action; and (5) The plaintiffs have failed to exhaust all administrative procedures to obtain the relief sought herein.

On June 19, 1969, the court granted the defendants leave to file a supplemental answer alleging the rescission of the October, 1968 ordinances on February 26, 1969. The thrust and purpose of the supplemental answer was to show that no legal impediment stood in the way of plaintiffs' proposed subdivision.

## HISTORY OF LAWSUIT TO DATE

In addition to the complaints and answers discussed above, certain other pretrial proceedings bear noting to understand this lawsuit.

When the lawsuit was commenced, the plaintiffs applied for a temporary restraining order and a preliminary injunction restraining the defendants from rezoning the Martin Road area for parks and recreation and from enforcing the October, 1968 ordinances. No order was signed because the defendants consented to hold their park rezoning plans pending a final decision in this case.

After the defendants filed their supplemental answer setting forth the rescission of the October, 1968 ordinances, the plaintiffs submitted a "Sanitary 5" form to Mayor Balen for approval. The "Sanitary 5" form, with the mayor's approving signature, is in the nature of an application by the City on behalf of a subdivider to the Erie County Health Department for approval of a sewer extension.

On November 14, 1969, this court gave the defendants two weeks to report on their disposition on the "Sanitary 5" form. On November 28, 1969, the plaintiffs and the court were advised that the mayor refused to sign the "Sanitary 5" form. This refusal effectively stalled any further progress in plaintiffs' attempt to obtain approval for their subdivision plans.

Afterwards, the defendants moved for a judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. The defendants argued that their affirmative defenses and the subsequent rescission of the October, 1968 ordinances established a "complete defense" to the plaintiffs' actions. Pointing to the specific allegations of the complaints, the defendants contended that the only act of any of the defendants complained of in the complaints was the passage of the October, 1968 ordinances. Since the specific acts complained of were rescinded, the defend-

ants argued, plaintiffs' actions were moot. This argument was directed against all plaintiffs, but especially against the Diocese whose right to dispose of its property, the defendants urged, was no longer impaired.

In light of the mayor's refusal to sign the "Sanitary 5" form, and noting that the complaint in intervention prayed for an injunction restraining *all acts* denying Negroes the equal protection of the law in obtaining decent housing, the court denied the defendants' motion in all respects.

Immediately prior to trial, extensive pre-trial statements of fact and memoranda of law were submitted by the parties. The trial began on April 9, 1970 and concluded on May 21, 1970, after 22 trial days. The parties then submitted post-trial briefs of facts and law. Oral argument was heard by the court on July 10, 1970. On all of the evidence introduced at the trial and arguments made by the parties, the court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## COLORED PEOPLE'S CIVIC AND POLITICAL ORGANIZATION

The C.P.C.P.O. filed its original certificate of incorporation on August 9, 1929. This membership corporation was formed

> "to promote good fellowship and to extend the acquaintance of its members and for social and political gatherings and lectures, and other amusements for the general welfare and benefit of its members."

The organization apparently went through a period of inactivity until a reactivation in February, 1962. Richard Easley has been president of this organization from its reactivation to date.

Shortly after reactivation, the organization showed interest in housing. Most of the members were (and are) residents of Lackawanna's first ward and many of them are employed at the Bethlehem Steel plant.

The minutes of the C.P.C.P.O. are replete with references to housing discussions among the membership, to non-member speakers concerning the housing situation, and to reports of C.P.C.P.O. representatives meeting with private and governmental officials about the housing problem. In January, 1968, for example, the C.P.C.P.O. made inquiries of Director of Development Frank Cipriani concerning available vacant land in Lackawanna. They made a written offer to purchase certain vacant land owned by the City in the second ward.

In March, 1968, the C.P.C.P.O. had obtained a "commitment" from the Diocese for approximately 30 acres of vacant land south of Martin Road. On March 15, 1968, the C.P.C.P.O. created K.P. H.A., a non-profit membership corporation for the development of low income housing. Two officers of C.P.C.P.O. became officers of K.P.H.A.

K.P.H.A. plans to act as its own general contractor in building the subdivision. However, to aid in this endeavor, it will call upon specialists in various fields. One step was taken early in 1969, when K.P.H.A. retained Cleon Cervas, a Buffalo real estate broker, to conduct a survey of potential home buyers in order to determine their eligibility for financing. After interviewing 23 individuals, Mr. Cervas tentatively determined that about 20 would be eligible for some kind of mortgage. Because of the uncertainty of when final applications would be made, these pre-qualifying interviews were *terminated after the lawsuit was* filed.

## DIOCESE OF BUFFALO

The Catholic Diocese of Buffalo encompasses within its territorial jurisdiction the entire City of Lackawanna with its predominantly Catholic population.

The Diocese is one of the largest landowners in the City. In addition to several small parish churches and schools which occupy small parcels of land, the Diocese "owns" a large complex located near South Park Avenue and Ridge

Road in the third ward known locally as "Father Baker's," which includes Our Lady of Victory Basilica, Our Lady of Victory Hospital, Father Baker's Orphanage, and a large high school facility. The Diocese also owns Holy Cross Cemetery and approximately 80 acres of vacant land, most of it situated in the area north and south of Martin Road.

The Diocese is represented by Attorney Kevin Kennedy, who participated in many of the negotiations for the purchase of vacant land not only with C.P.C.P.O. but also with the City officials.

## LACKAWANNA

The City of Lackawanna is a municipal corporation established under the laws of the State of New York. A special census taken of Erie County in 1966 showed a total population of 28,717 in Lackawanna, of which 2,693 (9.4%) were nonwhite.

The City is divided into three wards, the boundaries of which are defined in the City Charter. The first ward is the westernmost ward in the City, completely bounded on the west by the Bethlehem Steel plant situated on Lake Erie. A series of railroad tracks runs along the entire eastern boundary of the first ward with a bridge serving as the only connection within the City between the first ward and the second and third wards. The second ward comprises the middle sector of the City, bounded entirely on the west by the railroad tracks and on the east by South Park Avenue. The third ward is the eastern sector of the City, bounded on the east by the Lackawanna city line.

The City is bounded on the north by the City of Buffalo, on the east by West Seneca and Orchard Park, on the south by the Town of Hamburg, and on the west by Lake Erie.

The 1966 census figures show that 98.9% of 2,693 nonwhites living in Lackawanna live in the first ward, and these nonwhites comprise 35.4% of the total first ward population. Comparison of census figures in 1950, 1960 and 1966 shows that the percentage of nonwhites in the first ward has increased from 25% in 1950 to 35.4% in 1966. There is sharp contrast between the first ward and the other two. The 1966 census figures show 29 (0.2%) nonwhites out of a total third ward population of 12,229. Comparison of census figures in 1950, 1960 and 1966 shows a doubling in the white population of the third ward from 6,324 in 1950 to 12,200 in 1966.

The population of the second ward has changed little through the years, but it must be noted that, out of a 1966 population of 8,974, there was only one nonwhite.

The most pervasive influence on all Lackawanna life is the Lackawanna plant of the Bethlehem Steel Corporation, located on the shores of Lake Erie in the westerly part of the first ward. This plant, established there in 1901 and operated by the Bethlehem Steel Corporation since the early 20's, has grown to a massive industrial operation employing over 20,000 men. At present, it takes up at least half of the entire land area of the first ward. Recently, increasing industrial needs have led to an encroachment by the corporation on former residential land. For example, New Village, Bethlehem constructed housing located in the northern part of the first ward, is gradually being demolished for conversion from residential to Bethlehem use.

Unloading docks for ore boats, rail facilities, blast furnaces, coke ovens, open hearths, and mills for the manufacture of rails, beams, sheet steel, and many other steel products are located at Lackawanna. The blast furnaces and open hearths, which are the major sources of air pollution, are located in the northern part of the plant. To the south are situated shipping areas and other mills which do not contribute as heavily to air pollution. Across Route 5 in the southern portion and immediately south of Bethlehem Park, a residential area, is the strip mill which manufactures sheet steel. The plant continues to the south on both

sides of the highway into the Town of Hamburg. Included in the facilities in that area is the main office. Bethlehem Steel Corporation is the largest single taxpayer in the City and employs a full-time community relations man to work on City-plant problems.

At certain times in the steel making process, huge billowing clouds of dust, smoke, and other particles are spewed into the atmosphere, especially into the northern part of the first ward. However, the entire City of Lackawanna suffers from severe air pollution due primarily to the location of the Bethlehem Steel plant.

Nevertheless, there is a sharp contrast between the first ward and the other two wards in the amount of pollution, housing problems, congestion, and other environmental factors. The series of railroad tracks running along the eastern boundary of the first ward practically separate the first ward from the remainder of the City. The only connection between the first ward and the rest of the City is the single, long Ridge Road bridge. The east-west thoroughfares, located in Buffalo to the north and Hamburg to the south, are some distance removed and do not provide an effective means of travel from the first ward to other areas of Lackawanna.

The first ward is described in the Model City application which was prepared and submitted by the City of Lackawanna to the Department of Housing and Urban Development in 1967 in the following way:

" * * * This area is in very poor structural condition because of the age of dwellings and the poor environmental characteristics fostered by the Bethlehem Steel Company.

* * * * * *

Visual evidence substantiates the belief that housing deterioration and overcrowding within the M.N.A. (Model Neighborhood Area—first ward) are more than twice those of the city as a whole.

* * * * * *

Another major contribution to the physical blighting of the area (M.N.A.) is the smoke which blows from the stacks of Bethlehem Steel, spreading dirt, dust and pollution throughout the area."

The first ward has the oldest, most dilapidated housing, the highest residential density with the most housing units per acre, and it has the largest number of persons per housing unit. The Erie County Department of Health has classified the first ward as a "high risk area." There is a high infant mortality rate and tuberculosis is twice as prevalent as in the city as a whole. The juvenile crime rate is almost three times, and the adult crime rate is more than double, the city average.

The worst section of the first ward for housing and air pollution is in the area north of Ridge Road. Recently, of 126 housing units in that area, 74% of them was inhabited by blacks. The best housing in the first ward is in Bethlehem Park in the southern part. This housing was established by the Bethlehem Steel Company as an all-white residential area for employees of the Lackawanna plant. Until very recently, no blacks were allowed to live there.

In considering the issues in this case, the structure of city government and the duties of various city officials should be noted. A new Charter in 1964 considerably altered the makeup of city government. Under the old system, the mayor, elected for a two-year term, had a limited appointive power, no veto and, in the City Council, only voted to break legislative ties. At that time, there were four wards, each ward having one councilman. Because this system emphasized the role of the ward councilman, decision making reflected ward needs rather than the good of the City as a whole.

Under the new Charter, each ward has a councilman elected for a two-year term. In addition, there are two councilmen-at-large, elected for four years, making up a legislative body of five. The mayor, elected for a four-year term, now has a greatly increased and more effective role in city government. He is empowered

to appoint the Directors of Public Safety, Public Works, Development, and Parks and Recreation. Important to this case, he also appoints the members of the Planning and Development Board. As chief executive officer of the city, each department head reports to the mayor.

Mayor Mark Balen became mayor on January 1, 1968. Since the early 60's, he was a councilman. He testified that the transition from the old system to the new required considerable adjustment because it was difficult for the citizens and the ward councilmen to become accustomed to the diminished role of the councilmen in city government. Before enactment of the Charter, it was not unusual for the councilmen to usurp normally executive or administrative roles of the officers of city government. The mayor felt that it would take citizens and city officials some time to become used to the new Charter.

A particular question created by the change in the Charter was the power to approve new subdivisions. Under the old system, a subdivision was approved by a three-fourths vote of the Council. No standards for approval other than those exercised by the vote of the Council were set. What is now required for approval of subdivisions under the new Charter is confusing. The opinion of Frank Cipriani, Director of Development, is that the Planning Board has this authority, but such authority is not clearly set forth in the Charter or the Administrative Code. Furthermore, it was not clear from the evidence what standards govern the issuance of building permits.

When Mark Balen assumed the office of mayor on January 1, 1968, he appointed Frank Cipriani Director of Development. The Director of Development is the Executive Director of the Planning and Development Board and also of the Zoning Board of Appeals. The composition of the Planning and Development Board is set forth in City Charter Chapter 8, Section 8.3. The board consists of seven members—one councilman appointed by the City Council, one City official, and five citizen members to be appointed by the mayor to serve three-year terms. After Mayor Balen had completed his appointments to the board, four members of the board resided in the third ward, three in the second, and none in the first. There were no black members on the board.

There are three low income housing projects in the City of Lackawanna, all located in the first ward. Baker Homes and the Gates Avenue Project are operated by the Lackawanna Municipal Housing Authority, and Albright Court is privately owned.

The amount of vacant land left in Lackawanna is limited. Most of it is located in the third ward, and much of this is owned by the Catholic Diocese of Buffalo. The City owns 74 vacant lots in the second ward.

PLANNING

Various planning studies and reports were admitted into evidence for the light they shed upon the City's problems— past, present, and future. Among the most important of these are: (1) The Model City application submitted by the City of Lackawanna to HUD on April 29, 1967; (2) The Master or Comprehensive Plan and supporting reports prepared by Patrick Kane of KRS Associates, Inc.; and (3) A Study of Parks and Recreation for Lackawanna, prepared by the National Recreation and Parks Association and finally submitted by a report dated June, 1968.

The Model City application described all aspects of City life in detail. Housing supply and condition, public facilities, health services, educational services, the crime problem, social services, employment, and many other details of life in the City of Lackawanna were enumerated. The Model Neighborhood Area to which particular attention is paid in the application is the first ward. Some quotations from the application accent some of Lackawanna's problems:

"Lackawanna poses a unique problem in housing in as much as there is a physical boundary between the 'haves' and 'have-nots' in the city."

The first ward area is described in this way:

" * * * There is a high percentage of Negro and other minority groups in this area. This adds to the difficulty of relocation since Lackawanna is in fact a segregated community."

The Model City application was the source of much of the statistical information set forth in other parts of this decision.

The Comprehensive Plan or Master Plan was prepared by Patrick Kane of KRS Associates, Inc., a planning consultant firm. The State of New York and Mr. Kane entered into a contract to provide professional assistance in the development of the Plan. His work on the Plan is carried out with the cooperation of HUD, State of New York, and City of Lackawanna officials.

A Comprehensive or Master Plan, according to Mr. Kane, is a long-range statement of development goals for a municipality that uses an analysis of present conditions, determines the trends in the community, and forecasts its needs in relation to land use, community facilities, transportation networks, zoning ordinances, and capital improvement programs that relate to the goals of the community. However, the Plan is not fixed. The purpose of the Plan is to provide a general framework so that the City can make an intelligent and responsible decision relative to its development.

Mr. Kane began his work early in 1966. He prepared a number of detailed studies and plans in conjunction with the development of the Lackawanna Comprehensive Plan. These documents covered such fields as land use, population trends, economic analysis, transportation and zoning. He met monthly with the Planning and Development Board and the Director. During 1966 and '67, the Director was Nicholas Colello. He was replaced on January 1, 1968 by Frank Cipriani. At each monthly meeting, Mr. Kane and members of the board discussed in detail the studies and report as they were being prepared.

Mr. Kane presented three alternative land use plans to the board. Each plan designated the area south of Martin Road and east of the proposed McKinley extension as "residential—low density" and some or all of the area south of Martin Road and west of the proposed McKinley extension as recreation space.

Because of the poor environmental conditions, Kane wanted to restrict the residential use of the first ward as much as possible. However, because the board insisted upon keeping low densities in other parts of the City, he recognized that some residential use must be made of the first ward. The elimination of all residences in the first ward would create a difficult rehousing problem in Lackawanna because of lack of space in other parts of the City to provide housing at the densities required, and because of "the social problems which would result from the massive relocation of low income and minority groups into basically white and higher income areas of the City."

However, Planner Kane repeatedly urged the board not to use the area north of Ridge Road for residential purposes. He pointed out that this area suffered from the worst air pollution, had the most run-down housing, that private developers probably would not build there, that it would be difficult to obtain financing, and that Ridge Road separated this small area from the rest of the community so that the residents there would not receive proper services. Further, he urged elimination of Bethlehem Park because it is surrounded by industrial, railroad, and commercial enterprise, it is separated from the rest of the City, and it is too small to support schools, stores, and other community facilities. The elimination of housing in these areas would mean that there would be increased densities in other parts of the City.

However, in spite of Kane's urging, the board approved the continuance of Bethlehem Park for residential use, mainly single-family homes, and also adopted a resolution, on August 20, 1968, setting aside part of the area north of Ridge

Road in the first ward for residential use, preferably apartments.

Another basic difference between the board and Mr. Kane arose over the board's demand for encouragement of single-family dwellings and the limitation of apartments. Kane protested that this would deprive many members of the community—the elderly, the poor, the single person, some minority families and the newly-married—of housing opportunity.

From March to August, 1968, Mr. Kane met several times with the board, principally to discuss the use of the land north of Ridge Road. During the same period, without his advice or consultation, the board conducted joint meetings with the Zoning Board of Appeals about the "sewer crisis" and the use of the Martin Road land. Their alleged concern was never called to his attention, nor did they ever discuss with him or ask him to change the proposals for the Martin Road area.

After the board adopted its resolution concerning the use of the Ridge Road area on August 20, 1968, Mr. Kane then began his work to put the Plan in final form and have it printed. In the summer of 1969, Mr. Kane sent on to Mr. Cipriani the proposed Final Report and told him it was ready for final printing. He also sent to Mr. Cipriani a letter for the mayor's signature, giving his official endorsement to the Plan. The Final Plan was circularized to various City officials. Mayor Balen signed the letter and the Plan, in final form, was printed in October, 1969 and distributed. The Martin Road land use remained unchanged in the final Plan.

## PARKS AND RECREATION

Several of the City's actions challenged by the plaintiffs in this lawsuit are based, the defendants claim, on the City's urgent need for more recreation and park space. In 1962, the City included in its capital appropriations budget the sum of $25,000 for a recreational study to be made in 1967 or 1968. In 1966, the Capital Expenditures Board of the City recommended to the City legislators that a community recreation center costing $250,000, and an all-weather swimming pool costing $150,000 be included in the capital budget. In 1967, $25,000 was appropriated for recreation studies. Finally, on June 29, 1967, the City engaged the National Recreation and Park Association (hereinafter referred to as N. R. & P. A.) to do a study of the park and recreation facilities of the City at a cost of $2,400. Robert D. Buechner was in charge and Arthur T. Noren was a consultant, concerned primarily with the recreation program and financial considerations. Buechner concerned himself with site location and facilities.

Mr. Buechner and Mr. Noren worked in cooperation with the Lackawanna Department of Parks and Recreation and Mr. Kane, in connection with his report.

The N. R. & P. A. submitted two reports. The first was a preliminary report sent to the City Department of Parks and Recreation in November, 1967. The final report, dated June, 1968, was probably printed in August, 1968 and delivered to the City of Lackawanna early in October, 1968. After the preliminary report was delivered to the City in November, 1967, Mr. Buechner discussed it with Mr. Galanti, at that time Director of Parks and Recreation.

During 1968, he consulted further with the Department of Parks and Recreation and Mr. Kane about the final report. Both reports made similar recommendations for a community park and recreation center in the Martin Road area. Mr. Buechner recommended that a 40 or 50-acre community or district park, containing a community center with ice skating and swimming facilities and play fields for sports, be developed south of Martin Road and west of the proposed McKinley extension. The planner considered this site the best for a district park since this centrally located area was one of the last large areas left in the City, and because the most southerly portion of it bounded the south branch of Smokes Creek in a flood plain area.

According to the minimum standards of the N. R. & P. A., a community park for a city of 30,000 usually requires 70 acres, but Mr. Buechner testified that, because Lackawanna High School in the third ward and Friendship House in the first ward supplied many of the facilities usually found in a community park, 40 to 50 acres was sufficient to satisfy the recreation needs of the City of Lackawanna. Mr. Kane concurred in the N. R. & P. A. proposal.

During the planning process, neither Mr. Buechner nor Mr. Kane ever advised acquiring land east of the McKinley extension (eventually the K.P.H.A. site) for park or recreation. Nor did any City official ask the planners to consider this area to the east for park and recreation.

On February 15, 1968, the Planning and Development Board approved Alternate "C" which designated the area south of Martin Road and west of the Thruway for park and open space, and the area to the east (K.P.H.A.) for residential use. Moreover, the board at that time commented that the western area was too large for a park purpose, but decided to keep it designated "park and open space" until a more definite plan could be made.

The N. R. & P. A. also recommended the acquisition of South Park, which is within the city limits of Buffalo and borders Lackawanna to the north. An attempt by Mayor Balen to negotiate with the City of Buffalo in behalf of Lackawanna to purchase South Park was strongly and quickly rebuffed by City of Buffalo officials.

It should be also noted that the N. R. & P. A. report recommended that the City acquire a 200-foot right-of-way along both branches of Smokes Creek for park and hiking trails. Since this land was in the flood plain, the use for recreation was strongly urged. The City has not taken any steps to implement this proposal.

In early 1968, an attempt was made by the City to acquire vacant land for recreation purposes when several meetings were held by City officials with Kevin Kennedy, attorney for the Diocese of Buffalo. Mr. Kennedy informed the Lackawanna officials that, although no land was available for sale at that time, the Diocese was willing to lease land to the City north of Martin Road for a playground area. The mayor declined this offer since he felt that the City had enough playgrounds; that it needed a large area for a park, and that a lease would not fit in well with long-range planning for Lackawanna.

The City claims that it is difficult to plan in the Martin Road area because the location of the proposed McKinley Parkway Extension is in doubt. For many years, the Department of Transportation of the State of New York and Lackawanna officials have discussed the construction of a north-south highway connecting McKinley Parkway at the Buffalo City Line to the north with McKinley Parkway Extension in the Town of Hamburg to the south. The corridor for this proposed highway parallels Abbott Road and borders the westerly bounds of the proposed K. P. H. A. site. Although the exact bounds of this highway have not been fixed, nevertheless, because another subdivision is built up on the other side of Martin Road to the north of K. P. H. A., the ultimate course of this highway will not prevent the planning and construction of homes in the K.P.H.A. area.

## SEWERS

As noted elsewhere in this opinion, the City urges that many of its actions were taken because of a serious sewer situation in the City as a whole, and especially in the Martin-Abbott Road area. On some residential streets in that section, occasionally sewage has backed into cellars during heavy rainfalls.

The Lackawanna sewers are deficient in many other ways. For this reason, the City must spend a large sum of money to improve the system and upgrade it to state standards. For example, the sanitary and storm sewer lines are combined in many areas. Furthermore, on older residential streets the roof leaders and footing drains run to the sanitary sewer lines. Therefore, in

periods of heavy rain, the storm water rushes into the sanitary line causing overflows and cellar backups. Thaddeus J. Pieczonka, Superintendent of the Lackawanna Sewage Treatment Plant since the early 1940's, explained the impact of this combination of systems:

> "300 homes of four people each could be serviced by an 8–inch (sanitary sewer) pipe. Yet the same pipe would be full if all the footing drains and roofing drains were connected from 10 homes."

The Wilmuth Street Pumping Station located in the first ward is the main collection point for sanitary sewage in Lackawanna. From it, sewage is pumped to the primary treatment plant which is designed for a population of about 80,-000 people. Adjacent to the Wilmuth Pumping Station is the Well Street Pumping Station, recently remodeled at a cost of about $500,000. The Well Street Station pumps storm water flow from the first ward into Smokes Creek and, if there are overflows from the Wilmuth Station, pumps that material, after chlorination, into the creek.

Another crucial part of the Lackawanna system is the Seal Street Pumping Station, located in the second ward near the railroad tracks and next to the south branch of Smokes Creek. The Pumping Station intercepts the overflow from sanitary sewers and discharges it directly into the creek, after chlorination, in order to prevent sewage backing up into cellars. The overflow usually occurs during rainy weather but, because of line blockages, spillages can happen when it is dry.

The pumping of sewage into the creek is a hazard to health and must be corrected. As Mr. Katra, former Lackawanna Chief Engineer, bluntly put it, "Dilution is no longer a solution to pollution."

The best way to describe one ' of the problems in the third ward is in Mr. Pieczonka's language:

> "Just beyond St. Anthony Drive three 10–inch sewers funnel into one 15–inch

sewer. This 15–inch sewer in turn empties into an 18–inch sewer on Martin Road. However, this 18–inch sewer on Martin Road has another 15–inch sewer coming in from upper Martin Road and another 10–inch sewer from Ludel Terrace. Eventually, this 18–inch Martin Road trunk, with all the above mentioned connections, enters a 15–inch sewer on South Park Avenue. This sewer on South Park cannot handle the load which then spills into the adjacent 30–inch interceptor leading to the Seal Street Pumping Station.

> The Martin Road sewer becomes overloaded in the area near Maryknoll Drive even during light rains. Yet building another sewer on Martin Road will only aggravate the water pollution problem of Smokes Creek at Seal Place, because more raw sewage will be bypassed."

There are other citywide problems to solve. By order of New York State, Lackawanna must install a secondary treatment facility not later than 1972. In addition, Lackawanna must incorporate the sewers north of Ridge Road in the third ward into the Lackawanna system. For many years, the Buffalo Sewer Authority serviced this area at a rental of $250,000 a year. Because Buffalo insists that Lackawanna sever this connection, Lackawanna must spend a considerable sum to bring these sewers into the Lackawanna system.

The City of Lackawanna points to its Council minutes over the past ten years, noting the repeated reference to sewer problems and proposed sewer studies to indicate its continuing concern for a solution of this problem. However, many of the studies proposed have never been undertaken; many of the complaints received were filed without action; and many of the practical suggestions made for resolution of the problems have not been acted upon. From 1963 to 1967, when there were many complaints about sewer problems, the City of Lackawanna approved seven subdivision Sanitary 5 forms in the third

ward area and issued many building permits after the subdivisions were approved. On two occasions after the FHA had rejected subdivision applications because of sewer and flooding problems, the City nevertheless issued building permits for construction in these subdivisions. However, it should be noted that one subdivision application, that for Sharon Park subdivision, was disapproved because of lack of sewer facilities and also because the State Department of Transportation requested that this area be reserved for a highway.

At least since 1964, and on several occasions after that, Mr. Pieczonka made recommendations to alleviate the third ward sewer problem. He suggested that Lackawanna (1) Build a new 24-inch sanitary sewer from Abbott Road directly to the Wilmuth Street Pumping Station; (2) Hire a consulting engineering firm to make a detailed study of the Lackawanna sewer system; (3) Install the necessary pump and lines to force sewage from Seal Street to the treatment plant rather than have it discharge sewage into Smokes Creek; (4) Televise the Martin Road sewer from Abbott Road to South Park to determine if any obstruction exists in the sewer; and lastly, (5) Eliminate the roofing and footing drains from the older buildings. These last two suggestions could be undertaken quickly without large expense to the City.

A recent independent study made of all Erie County sewer systems strongly recommended that the roof leader connections be separated from the sanitary sewers in Lackawanna. A few years ago, the City passed an ordinance requiring this separation but an enforcement process was not begun until June, 1969 when the state directed that the connections had to be eliminated or the City would lose state aid.

The 1963 budget included an authorization for a comprehensive sewer study and a Council resolution of October, 1968 requested a similar study but, in spite of the claimed "sewer crisis," these studies have not been undertaken.

Furthermore, the City has taken no action either to examine or put into effect the other suggestions made by Mr. Pieczonka.

FLOOD PROBLEM

On about six occasions since 1942, Smokes Creek flooding has substantially damaged certain areas in Lackawanna. To prevent this, the Corps of Engineers undertook—and has almost completed—a flood control project. The Corps issued in 1965 a flood plain information report for the Smokes Creek basin.

The flood plain report provided contours for statistical prediction of floods. The levels used were: One flood in a period of 250 years; one in a period of 100 years; one in 50 years, and one in 10 years. As an example, the contour line shown at the 50-year level means that, based upon past history, the statistical prediction is that once every 50 years the water level will come to the level of the contour line shown on the map.

The report contained a number of recommendations. It urged that, by the use of zoning, restrictions be placed upon land most frequently flooded. Lackawanna is authorized to enact these ordinances, but has not done so as yet. The report strongly urged that flood plain areas be used for park or recreation, without the construction of expensive buildings. Some of the older residences in Lackawanna were constructed below the 50-year level and a few as low as the 10-year level.

During the testimony, there was reference to the Martin Road area flood problem. Martin Road itself is at a higher level than the Creek and well removed from any flooding area. Since the K.P.H.A. subdivision abuts Martin Road to the south, the north branch is not of particular concern to us. The land of the proposed subdivision drains from Martin Road in a southwesterly direction, and eventually to the south branch. There is a ditch located in the southwesterly portion of the subdivision recently deepened and widened by the

Corps of Engineers. This ditch facilitates the drainage of this subdivision and also provides drainage for the Ludel subdivision, which is generally to the east and on the other side of the Baltimore and Ohio tracks which run along the easterly side of the K.P.H.A. subdivision. The lands lying to the south and west of the subdivision are open fields dropping off gently to the south branch.

Some sublots, generally in the Southwestern part of the K.P.H.A. subdivision, lie within the contour of the 100–year projected flood area. There were five sublots also within the 50–year area. The site engineer for the Federal Housing Administration, in determining whether or not this area was suitable for a subdivision, considered the flood plain report and the improvements made and proposed by the Corps of Engineers. He determined that, if fill was provided in certain other areas and required standards met, the land was feasible for the construction of the proposed subdivision. Based upon the F.H.A. investigation, the plaintiffs received a letter of feasibility from the F.H.A. on March 18, 1969. By this letter, the F.H.A. states that financing assistance will be available for residential construction on this site if K.P.H.A. meets F.H.A. standards.

## EVENTS LEADING UP TO THE PASSAGE OF THE OCTOBER, 1968 ORDINANCES

### Other Recently Approved Subdivisions

As population statistics in 1966 indicate, there exists in the City of Lackawanna a *de facto* separation of the races. Almost all of the Negro population of the City lives within the first ward, while the population of the second and third wards is almost completely white. The population of the third ward has increased in recent years while the population of the first ward has decreased. One reason for this increased white population in the third ward is the number of subdivisions approved in Lackawanna's third ward from 1963 to 1967. A catalog of recently approved third ward subdivisions, derived from the official records of the Erie County Health Department, appears below:

1. *Willett Park Subdivision:* Sanitary 5 form signed by mayor; approved by Erie County Health Department July 16, 1963—68 lots.

2. *Pacific Subdivision:* Sanitary 5 form signed by mayor; approved by Erie County Health Department July 16, 1964—18 lots.

3. *Autumn Acres Subdivision:* Sanitary 5 form signed by the mayor; approved by Erie County Health Department July 23, 1965—138 lots.

4. *Burke Subdivision:* Sanitary 5 form signed by mayor; approved by the Erie County Health Department September 9, 1965—7 lots.

5. *Meadowbrook Subdivision, Part 3:* Sanitary 5 form signed by mayor; approved by the Erie County Health Department April 20, 1965—11 lots.

6. *Smith Subdivision:* Sanitary 5 form signed by mayor; approved by the Erie County Health Department on February 2, 1965—52 lots.

7. *Majestic Acres Subdivision:* Sanitary 5 form signed by mayor; approved by the Erie County Health Department February 3, 1967—27 lots.

The records of the Buffalo Office of the Federal Housing Administration indicate the existence of the following additional subdivisions in Lackawanna's third ward, even though there is no reference to such subdivisions in the Lackawanna records or Erie County Health Department records:

1. *Abbott Heights Subdivision* (Edison Street). Subdivision deemed not feasible on April 7, 1964—32 lots.

2. *Ludel Subdivision* (Ludel Terrace and Sander Drive). Subdivision deemed not feasible January 8, 1964 but houses are in fact being constructed in the subdivision—83 lots.

It is also important to note the number of construction permits for residential units issued by the City in the third ward from 1964 to 1968. There were 129

permits issued in 1964, 163 in 1965, 108 in 1966, 84 in 1967, and 61 in 1968.

*First Moratorium Resolution passed by the City Council on May 15, 1967*

At a meeting of the City Council on May 15, 1967, Resolution 98 was moved by then Councilman (now Mayor) Balen and carried unanimously. It directed the Department of Development and Engineering to refuse to issue building permits in new subdivisions already approved and to refuse to approve any new subdivision applications. Four reasons were given by the Council for the passage of this resolution: (1) The existence of many newly approved subdivisions and streets in the third ward; (2) the constant flooding and sewer backups; (3) The present inadequacy of the sewer system; and (4) Certain new third ward subdivisions which were planned. (This ordinance was enacted long before discussions began about the proposed K.P.H.A. subdivision.)

On the same day, May 15, 1967, in addition to moving Resolution 98, Mr. Balen also requested the City Attorney to draw up an ordinance waiving the zoning ordinance to permit Frank Cipriani to build a multiple dwelling at Abbott and Pacific. This intersection is in the third ward, not far from the Martin Road area. The ordinance was adopted by the Council in August, 1967, vetoed by the mayor, and later, on motion of Mr. Balen, the mayor's veto was overridden. Because of difficulty of financing, Mr. Cipriani was not able to build the multiple dwelling desired.

At a City Council meeting on August 21, 1967, Resolution No. 112 was passed unanimously rescinding the May 15, 1967 moratorium resolution. The premises of this resolution were an improved sewer situation and a directive by the Council to the Engineering Department to make a sewer study. In rescinding the prior moratorium resolutions, the Council went on record admonishing against the approval of new subdivisions in the flood areas. At that meeting, even though the resolution rescinding the moratorium was passed unanimously. Councilman Balen asked for a legal opinion on the moratorium concept.

Entered in the minutes of the City Council meeting of September 18, 1967 was the opinion of the City Attorney, Nicholas Haragos, concerning the moratorium resolution passed on May 15, 1967. His opinion was that the May 15, 1967 moratorium was an illegal "taking" of property because it inhibited the issuance of building permits in already approved subdivisions. The treatment was unequal because it disadvantaged owners of property in subdivisions by barring them from receiving permits, while allowing adjacent property owners to obtain them.

*Other Events Occurring in 1967 Which Are Part of the Background of the Passage of the October, 1968 Ordinances*

The October 19, 1967 minutes of the C.P.C.P.O. reflect the concern of the members about the demolition of housing in the first ward and the need for relocation plans. Mr. Colello, then Director of Development, attended that meeting and told the members that, in his opinion, no builders would build homes for them in the third ward.

At the October 23, 1967 meeting of the Planning and Development Board, Patrick Kane discussed the housing problem. He explained that, in order to provide proper housing for all of the residence of Lackawanna, it was necessary to use a variety of structures— single-family dwellings, town houses, garden apartments, and apartment dwellings. He pointed out that it was not possible to have only single-family dwellings because of the cost of land, the need to have certain densities of population so that the services of schools, parks, and stores could be properly provided, and the necessity to provide for residents of all ages and economic backgrounds. He told them that housing should be discouraged in areas of the City where the adverse effects of smoke, noise, or congestion could not be abated.

Because of these factors, special attention was required for the planning of housing in the first ward. He discussed the first ward situation in the following way:

"Now why do we even want to put houses in the first ward again. They are not going to be as good there as they are going to be somewhere else. One reason is because it's a transitional neighborhood, a starter neighborhood. There [sic] people that live there can't afford to live somewhere else until they can get enough money to move. Or maybe because of the race issue. Again you can't live in the past on that issue because we have laws that are doing something about that every day. So if we think there is going to be a barrier against race across that railroad track, we may as well forget planning altogether."

He explained to them that, with the use of federal funds, old patterns of living had to change. He said:

"An implied subject in all of this discussion we have had here, if we talk about changing the second ward, do you know how we are going to do it. We are going to do it with some kind of federal aid I'll guarantee you that and you know what that's going to mean. It's going to mean that that bridge has been broken and it's not going to be any one man holding any other man back from buying a home. We will never advertise this at a meeting because that's a dangerous approach to the general population just as saying that we are only going to build public housing. You don't say things like that publicly."

Emmett Wright, Chairman of the C.P. C.P.O. Housing Committee, spoke at the meeting. He told the board that the first ward Negro desired to move out of the first ward and acquire a single-family residence.

As early as December, 1967, the minutes of the C.P.C.P.O. reflect that Harold Thornton, a professional housing consultant, had been contacted by the organization to assist it in its efforts to obtain housing in the third ward. At the November 2, 1967 meeting of the C.P.C. P.O., a survey was taken to determine how many people would be interested in purchasing homes in a third ward subdivision development.

*Early 1968 Events*

In early January, 1968, representatives of the C.P.C.P.O. visited Frank Cipriani to inquire about city-owned land which may be available for subdivision development. Cipriani, who had been in office but a few days, replied that he knew of no city-owned land available at that time, but that he would investigate to see if such land existed. In a letter dated January 23, 1968, and before Cipriani responded to the inquiries of the C.P.C.P.O. representatives, that organization offered to purchase 74 contiguous lots in the second ward near Electric and Van Wick Streets. The C.P.C.P.O. was later informed that their offer had been tabled by the City Council for study.

During this period, a group of ministers visited Mayor Balen to discuss with him the offer to purchase. The mayor told them that he thought that such purchases could only be completed after a public bid, but told them he would look into it. They heard nothing further from him.

During the same time period, newly-installed officers of the City of Lackawanna approached Attorney Kevin Kennedy about the City's possible acquisition of diocesan land in the Martin Road area. The first meeting occurred on January 8, 1968, with Frank Cipriani and other City officials present. Kennedy at that time informed them that there was presently no land for sale. He explained that the land around Martin Road was reserved for church use. Later in January, 1968, a second meeting in Kevin Kennedy's office was held concerning the City's proposed purchase of Martin Road land. Present at that meeting were Cipriani and Mayor Balen. Kennedy repeated his "no sale" position, but said he would let the City

know if the Diocese should change its mind and decide to offer any of the Martin Road land for sale. At the previous meeting, Kennedy had suggested a short term lease of land north of Martin Road for the purpose of erecting a playground, but this suggestion was unacceptable to Mayor Balen.

In the early part of 1968, the Planning and Development Board was told that it would have to finally approve the comprehensive plan as soon as possible. At a meeting of the board on January 23, 1968, Mr. Kane explained to the new board members the nature of a comprehensive plan and summarized what had been accomplished to date on the Lackawanna plan. In January and February of 1968, five new members were appointed by Mayor Balen to the Planning and Development Board. After these appointments, there were four members of the board from the third ward, three from the second ward, none from the first ward, and no black members.

Another meeting of the Planning and Development Board was held on February 1, 1968. Mr. Kane made a further explanation of the past work of the board and explained to them the three alternative land use plans which the prior board had considered. In speaking to them about the first ward, he said:

"The Negro has indicated tremendous concern about his suspected confinement to the first ward. At almost every one of the Planning Board meetings, collectively they have stated they do not feel that any residential use should be allowed to remain in the first ward. In piercing through what they say, what they really mean is don't keep us in the first ward, let us live where our income or our desires allow us. You have a tremendous pressure building up in your community on the part of the non-whites to go across the bridge."

On February 15, 1968, the new Planning Board took under consideration the three alternative land use plans submitted by Kane for approval as the final plan. These were the same alternatives considered by the former board. Each of these alternative plans designated the area south of Martin Road and east of the proposed McKinley extension as "residential-low density." Each designated some or all of the area south of Martin Road and west of the proposed McKinley extension as recreation space.

The basic difference in the various alternatives was the use of areas in the first ward. Alternative "A" preserves residential use in the area south of Ridge Road in the first ward, including Bethlehem Park. It eliminates, however, any residential use of the area north of Ridge Road in the first ward. Alternative "B" completely eliminates the first ward as an area for residential use. Alternative "C" provides for the continued residential use of the area in the first ward south of Ridge Road, but not including Bethlehem Park.

At the meeting of February 15, 1968, the Planning and Development Board generally approved Alternative "C" with certain modifications. The prior Planning and Development Board had approved Alternative "C" without modification. The modifications to Alternative "C" devised by the new board are: (1) First Ward: The retention of Bethlehem Park as a residential area and a stated preference for as many single-family dwellings as possible in areas previously designated medium density residential use; (2) Second Ward: High density residential area eliminated around commercial and governmental complex and, again, as many single-family homes as possible; and (3) Third Ward: The board expressed some doubt about consultant's intention with respect to the Ridgewood Village area, presently designated medium density area. Whatever his plans were, however, they went on record as preferring single-family dwellings. In addition, the board thought that the area in the Martin Road area designated in Alternative "C" for a possible school site and open space is "too large for open space or park area." They decided to leave this question open for future discussion.

At the March 12, 1968 meeting of the Planning and Development Board, the results of the February 15 meeting were reviewed and Mr. Kane presented Alternative "D" which, he represented, was a reflection of Alternative "C" with the modifications approved by the board on February 15. Mr. Kane noted that he had originally proposed increasing the City's population from 28,000 to 36,000. Alternative "D", by reducing densities, anticipated a population of 31,000 or 32,000. He again told them that their emphasis upon single-family homes for most of Lackawanna residents was not practical or desirable, since this would eventually cause a decline in population, a lower tax base, and a housing shortage for residents who do not need, or cannot afford, a single-family home.

The minutes of the March 28, 1968 meeting of the Planning and Development Board reflect that the board did not want Alternative "D" suggested by Mr. Kane. Alternative "D" did not propose the area north of Ridge Road in the first ward for a residential purpose. The board adopted a resolution approving Alternative "C" with the following modifications. In the first ward, it desired the continued residential use of Bethlehem Park and the use of the area north of Ridge Road for commercial purpose with some residential use, preferably apartments. In the second and third wards, it wanted the high residential density to be eliminated. In these wards, the board wanted single and two-family homes, with three and four-family apartments only when necessary to obtain a population of about 31,000.

At the same meeting, the board discussed rumors about the Martin Road property owned by the Diocese of Buffalo. Several members heard that the Diocese planned to sell this property to an organization for low income housing. The board directed Cipriani to conduct an inquiry regarding these rumors. Following the board's direction, Cipriani sent a letter to Kevin Kennedy about this matter.

In mid-March, 1968, the C.P.C.P.O. met with Attorney Kevin Kennedy concerning the sale of Martin Road property for the proposed subdivision. Shortly thereafter, on March 23, 1968, members of the C.P.C.P.O. incorporated K.P.H.A. as a housing or mortgagor company. In April, 1968, Buffalo and Lackawanna newspapers reported the proposed sale of Martin Road property by the Diocese to K.P.H.A.

In April, 1968, a petition was circulated in the third ward opposing the sale of land by the Diocese on the basis that the proposed housing would be "low income" housing. Another petition with 3,000 signatures was sent to Bishop McNulty of the Diocese, opposing the sale of the land "due to lack of schools and inadequate sewers." That petition carried the names of the incumbent mayor, the then president of the City Council, and the incumbent president of the City Council. Mayor Balen explained at trial that he did not sign the petition but that, in all likelihood, his wife did.

A meeting was held in Ridgewood Village in the third ward for the purpose of protecting the proposed subdivision. As the opposition mounted to the proposed subdivision, the newspapers covered the events in detail. One group particularly opposed to it was the third ward group known as "Taxpayers Interested in Civil Affairs" (known as TICA). A leader in the TICA organization was Henry Starzynski, who sent a strident letter to the Lackawanna Leader adamantly opposing the proposed sale to K.P.H.A.[1]

---

1.

"Frank E. Hollins, Publisher
Lackawanna Leader
Dear Mr. Hollins:
 I wish to alert the citizenry of all the suburban areas within the geographical tangents of the 'Roman Catholic Diocese of Buffalo' to a problem so grave, with ultimate ramifications so serious as to directly jeopardize the very existence of our finest suburban communities. Residents of West Seneca, Cheektowaga, Lancaster, Amherst, Orchard Park and Hamburg should take particular note.
 As a 'Roman Catholic' I am appalled, shocked and ashamed of the arrogant,

*Human Rights Commission Activity in Face of Growing Concern about Proposed Subdivision*

Because of the mounting opposition to the proposed Kennedy subdivision in the third ward, and because of the possible racial overtones that lie behind this opposition, Emil Cohen, a Commissioner of the New York State Human Rights Division, requested Stanley Gworek, the Chairman of the Lackawanna Human Rights Commission, to hold special meetings to discuss the problems generated by the proposed construction of the third ward subdivision by the C.P.C.P.O. As a result of the State Commissioner's request to the Lackawanna Human Rights Commission, Chairman Gworek arranged to meet with TICA and other concerned white citizens and also to meet with the C.P.C.P.O. to discuss the problems facing the community as a result of the rumored subdivision.

On April 10, 1968, Gworek, together with Cohen, met with the TICA group and, during the course of this meeting, heard the people voice their concern over the sewer situation, the need for new schools, and their interest in protecting their property values which they thought would diminish if low income housing was constructed in the third ward. Cohen pointed out that there were practical and legal methods of insuring that the high quality environment in the third ward neighborhoods would be maintained even if the first ward group constructed homes in the third ward. He suggested that restrictive covenants could be attached to the land, requiring certain minimum values on all houses to be constructed in a particular neighborhood. He ventured the opinion that the first ward people who wished to move to the third ward would be equally as concerned with schools and sewers as the people in the third ward present at the meeting. One man at the meeting interjected that "the Negro in the third ward have been accepted [sic] without incident and a grand scale integration now instead of the gradual way now being down [sic] will only cause more unrest and misunderstanding." At the end of this meeting, it was agreed that another meeting would be scheduled later in conjunction with the first ward group, at which representatives of both sides would meet and exchange their views.

ruthless, viciously totalitarian powers assumed and exerted by Bishop McNulty and the Hierarchy of the Roman Catholic Diocese of Buffalo.

It has now become apparent that the Bishop and the Catholic Hierarchy have embarked on a calculated scheme to physically alter our choice suburban communities and thereby promote their religiously oriented philosophies while the unsuspecting property owners of these areas will be compelled to suffer the inherent agonizing consequences.

The first phase of an apparent Diocesan master plan is to be instituted on a Catholic Diocese tract of land on Martin Road in Lackawanna, where an integrated, low-cost housing development is to be injected. This low-cost housing development would be immediately adjacent to a developed area with homes and property presently valued at from $20,000 to $60,000.

The already overburdened taxpayers throughout our far-flung suburbs may well be faced with additional skyrocketed taxes inherent with these concentrated developments.

Zoning laws may well become flexible when strained by the 'men of the cloth.'

The Diocesan attorney, Mr. Kevin Kennedy has made various vain attempts to white-wash the dark consequences of this critical problem.

I urge all property owners throughout the Western New York suburban areas to evaluate their own position in relation to this potential danger.

It appears apparent that the Catholic Hierarchy of the Buffalo Diocese has joined the ranks of the many irresponsible politicians in this "give-away" ideology who are attempting to placate the shamelessly immoral, savagely violent groups who are rioting, burning and killing their way into a hideously shameful page of our nation's history.

These 'give-away' programs are tearing at the very fabric of our Nation's economy and our country's very existence, while the decent, toiling, tax-paying white and colored Americans alike are forced to pay the expenses of certain unscrupulous politicians and certain clergy as well.

HENRY PAUL STARZYNSKI
Lackawanna"

The meeting with the first ward group was held on April 24, 1968 and again Gworek and Cohen conducted the meeting. Cohen briefly summarized the attitudes of the third ward group expressed at the first meeting. He stated that they were concerned with sewers, schools, and housing values. He noted that, "if these are the only objections to the sale of the land, we now have a common ground to begin." Harold Thornton, the K.P.H.A. consultant, acted as spokesman for the first ward group expressing their attitudes toward moving to the third ward and the recently evidenced opposition to this move. He referred to rumored threats of violent action if first ward families attempted to move to the third ward, but assured that arrangements had already been made through the Justice Department and the Attorney General's office if these threats had any basis in fact. He suggested a series of meetings be set up to orient both groups on the common problems of living together in the same community. As to the sewer problem, Thornton noted that the mayor's budget had some provisions for sewers in this area, but that further improvement had been hindered because of a personality conflict between the present administration and the City Council. As in the first meeting, it was agreed that another meeting would be held where representatives of this group would meet with representatives of the third ward group to discuss their problems.

On April 29, 1968, Emil Cohen wrote Stanley Gworek inquiring about the present prospects for the third meeting between the two groups. Apparently this meeting was never held.

On June 25 and 26, 1968, Gworek, with other members of the Lackawanna Human Rights Commission, traveled to New York City to discuss the K.P.H.A. plans with officials of the Department of Housing and Urban Development. This New York City meeting was arranged at least partially by Harold Thornton, acting for the K.P.H.A. At the New York City meeting, the anticipated Fair Housing Act of 1968 was discussed. He testified that he intended to return to Lackawanna and "prepare the parties involved for the inevitability of the action which seemed to * * * confront (Lackawanna) city officials with the things which were going to happen based on the new federal law * * * " He reported the results of the meeting to Councilmen DePasquale and Wodzinski.

However, Richard Easley, the president of C.P.C.P.O., and other members of that organization apparently misunderstood the reason why the Lackawanna Human Rights Commission had traveled to New York to meet with the HUD officials. Robert Pino, the Negro member of the Lackawanna Human Rights Commission, was chastised by Easley and others for meddling in C.P.C.P.O. affairs. The fact is, however, that the K.P.H.A. consultant, Harold Thornton, arranged the meeting and asked the members of the Lackawanna Human Rights Commission to attend.

*April and May Meetings of the Planning and Development Board*

On April 25, 1968, the Planning and Development Board met again. In speaking about the area north of Ridge Road in the first ward, Mr. Kane informed the board that it would be "very hard to develop any kind of rational [sic] to support * * * (their) recommendation of residential use in this area." He pointed out to them that the part of that area which was available for residential use was too small and, furthermore, since Ridge Road was heavily traveled, it separated the north side from the rest of the area. After discussion, the board refused to follow Kane's advice and adhered to their former decision.

On May 1, 1968, Mr. Kane met again with the board. He attempted once more to persuade them not to use the area north of Ridge Road for residential purposes. The board was warned that pri-

vate developers would refuse to build there, that housing would deteriorate, and that the land available was too small to provide the citizens there with necessary services needed for a residential neighborhood. In spite of that, the board again insisted that residential use, preferably apartments, be made of this area.

### Meetings of the Zoning Board of Appeals and the Planning and Development Board

On January 17, 1968, the District Director of the Corps of Engineers wrote a letter to municipal officers in Erie County, including Lackawanna, explaining that the Corps had completed a flood plain information report for the area and offering assistance to communities in developing flood plain regulations.

Later, when the rumors started to circulate about the sale of the Diocesan land to K.P.H.A., Mr. Cipriani called a joint meeting of the Zoning Board of Appeals and the Planning and Development Board on April 20, 1968.

At a meeting of the Lackawanna Zoning Board of Appeals held on May 7, 1968, Mr. Cipriani discussed the Smokes Creek flood plain study and gave a copy of it to each member of the board. Mr. Cipriani pointed out to the board that "this report makes definite reference to the land on Martin Road and at the present time we are having quite a problem with this area. * * * They (Corps of Engineers) would prefer to see the flood plain areas developed for recreation * * *" He asked the members to read the report so that it could be discussed at a later meeting. It should be noted that Martin Road itself is well out of the flood plain area, and only the southwest part of the K.P.H.A. subdivision is within any part of the flooding zone.

On June 11, 1968, another joint meeting of the two boards was held. A Corps of Engineers representative explained the flood plain report in detail to the members.

### Actions of the Planning and Development Board Immediately Prior to the City Council's Passage of the October, 1968 Ordinances

As a result of the joint meeting held on June 11, 1968, Mr. Cipriani was instructed to request Edward Kuwik, the Chief Engineer of Lackawanna, to prepare a sewer study for the Martin Road area. At an August 1, 1968 meeting of the Planning and Development Board, Kuwik's response to this request was to make available the March, April, and May, 1968 report prepared by Thaddeus Pieczonka, the Chief Chemist, which was distributed for consideration by members of the board.

Two meetings were held on August 20, 1968. The first was a special meeting of the Planning and Development Board called to consider the map prepared by Mr. Kane, which showed the land use proposal for the north of Ridge Road area. The sketch proposed that 15.9 acres be set aside for residential use. The board gave its final approval to that proposal.

This meeting was followed by a joint meeting of the Zoning Board of Appeals and the Planning and Development Board. Also present at that meeting were the City Clerk, Gerald DePasquale, and the Chief Chemist, Thaddeus Pieczonka. Cipriani stated that the meeting was called for the special purpose of discussing the acute sewer conditions existing in the southeast portion of the second and third wards of the City of Lackawanna. Noting that the board members had been given a copy of the March, April, and May, 1968 report of Mr. Pieczonka, Mr. Pieczonka was requested to interpret it. Mr. Pieczonka explained in detail how the sewer lines in this area became overloaded, causing either cellar backups or overflows of sewage into Smokes Creek. He informed

them that, if the creek pollution was not corrected, the City would lose $55,000 a year in state financial aid. He recommended to the board a comprehensive sewer study, the separation of storm and sanitary sewers, the elimination of roof leaders from the sanitary system, televising of certain sewers to find obstructions, and the construction of a 24-inch sewer line from Abbott Road directly to the Wilmuth Pumping Station. He told the board that, in his opinion, it was most doubtful that the Erie County Department of Health would approve a subdivision application in an area where the City was bypassing raw sewage into a stream.

The first motion made at this meeting was to direct a communication to the City Council recommending that the Council hire a consulting engineer to make a study of the sewer problems in the entire southern part of the second and third wards of the City. This motion was passed unanimously.

No action was taken on Mr. Pieczonka's other recommendations. Instead, Mr. Cipriani initiated discussion about discouraging development in this area until the sewer problem was resolved. Pieczonka responded that, if both boards were going to go on record discouraging development in this area, that area should be defined as the southeast part of the second and third wards to the City Line of Lackawanna. A motion was then made that the joint boards issue a moratorium on all new subdivisions until such time as the sewer problems abated. This motion was carried unanimously.

Cipriani then initiated further discussion concerning the possible rezoning of the southeast portion of the second and third wards for the purpose of park and recreation. He pointed out that this suggestion would fill a two-fold need: (1) It would provide for the much needed park space in one of the last vacant areas in Lackawanna; and (2) It would insure against the worsening of sewer problems and the Smokes Creek flooding problems. In addition, the members discussed the flood plain report prepared by the Corps of Engineers. A motion was then made to recommend that the City Council rezone a portion of the area described by Mr. Pieczonka for recreation. The motion reads as follows:

" * * * [T]he Zoning Board of Appeals and the Planning and Development Board recommend to the City Council that any and all vacant open land situated within the following boundary—south of the north branch of Smokes Creek, bounded by the B & O tracks on the east, on the south by the city line at Willett Road and on the west by South Park Avenue approximately 1000 feet east of South Park Avenue, be designated for open space or park area."

The motion was passed unanimously.

When he testified, Mr. Pieczonka described the problem area as all of the southern part of the second and third wards south of the north branch of Smokes Creek, extending from South Park Avenue on the west to the city line on the east. The area encompassed by the board's resolution is much smaller than that described by Mr. Pieczonka. The area in the resolution did not include any part of the second ward or any part of the third ward east of the Baltimore and Ohio tracks.

### Meetings with HUD about Sewers

Harold Thornton arranged a meeting in New York for Lackawanna and HUD officials to discuss the availability of federal assistance for Lackawanna sewers. Although a number of Lackawanna officeholders went to New York on September 11, 1968, the day of the meeting, many of them did not attend. Mr. Cipriani and some members of the Council went, but neither Mayor Balen nor John O'Connor, City Engineer of Lackawanna, did. Mr. O'Connor explained his absence

by saying that the City did not want to appear "totally committed." Mr. O'Connor's supervisor, Edward Kuwik, Chief Engineer, went but left before the meeting was over. Pieczonka and an Assistant City Attorney were not informed of the correct meeting time and, when they arrived, the meeting was almost finished.

On September 18, 1968, HUD officials inspected the Lackawanna treatment plant in Mr. Pieczonka's company. However, the conversation centered upon moneys available for secondary treatment. Mr. Pieczonka could not recall any discussion about the Martin Road problem.

*October, 1968 Ordinances: Their Passage and Rescission*

The City Council, on October 7, 1968, heard a first reading of the rezoning and moratorium resolutions. The zoning ordinance [2] designated an area in the third ward exclusively for parks and recreation. This area, smaller than that proposed by the Planning and Development Board, was in the third ward south of the north branch of Smokes Creek. However, it included the area where the K.P.H.A. subdivision was located, but excluded the area covered by Majestic Acres subdivision which was approved in 1966, and where sublots were still available for construction.

2.

### ZONING ORDINANCE AMENDMENT
### CITY OF LACKAWANNA

BE IT ENACTED by the City Council of the City of Lackawanna, New York, as follows:

The Zoning Ordinances of the City of Lackawanna adopted by the Common Council on September 7, 1937 and all ordinances amendatory thereto and the Building Zone Map of the City of Lackawanna are amended as follows:

The following described area is hereby designated as an area exclusively designated for parks and recreation:

BEING ALL OF LOTS 435, 434, 433 AND PARTS OF LOTS 352, 353, 354, 355, 432, 431, 430 and 429, ALL BEING IN T. 10, R. 7 OF THE BUFFALO CREEK RESERVATION.

BEGINNING AT A POINT IN THE CENTER LINE OF THE NORTH BRANCH OF SMOKES CREEK WHERE IT INTERSECTS WITH THE WEST LINE OF GREAT LOT 352, TOWNSHIP 10, RANGE 7, THENCE RUNNING SOUTHERLY ALONG THE WEST LINE OF GREAT LOTS 352 AND 435, TOWNSHIP 10, RANGE 7 TO THE CENTER LINE OF WILLET ROAD, THENCE EASTERLY ALONG THE CENTER LINE OF WILLET ROAD TO THE WEST LINE OF THE NEW YORK STATE THRUWAY, THENCE RUNNING NORTHERLY ALONG THE NEW YORK STATE THRUWAY TO THE WEST LINE OF THE B. & O. RAILROAD, THENCE RUNNING NORTHWESTERLY ALONG THE WEST LINE OF THE B & O RAILROAD TO THE CENTER LINE OF NORTH BRANCH OF SMOKES CREEK, THENCE RUNNING WEST ALONG THE CENTER LINE OF THE NORTH BRANCH OF SMOKES CREEK TO THE WEST LINE OF GREAT LOT 352, TOWNSHIP 10, RANGE 7, THE POINT OR PLACE OF BEGINNING.

If any section, subsection, sentence, clause or phrase of this ordinance amendment is, for any reason, held to be invalid, such decision shall not affect the validity of the remaining portions of this ordinance.

The City Council hereby declares that it would have passed this ordinance amendment and each section, subsection, clause and phrase thereof, irrespective of the fact that any one or more sections, subsections, sentences, clauses or phrases be declared invalid.

THIS ORDINANCE SHALL TAKE EFFECT IMMEDIATELY.

Dated: Lackawanna, New York
 October 7, 1968

APPROVED:

(s) MARK L. BALEN

MARK L. BALEN, Mayor

The second ordinance [3] created an indefinite moratorium on the approval of new subdivisions because of the sewer problem. On October 14, 1968, a public hearing was held on the two ordinances. On October 21, 1968, the City Council read and voted final passage of both ordinances and they were signed into law by defendant, Mayor Mark L. Balen. The subdivision moratorium ordinance imposed a ban only on the approval of new subdivisions and had no effect on Majestic Acres, which was only half complete at the time of the passage of the ordinance. In addition, this ordinance did not have any effect on single-family residential construction proceeding in the third ward outside of subdivisions.

At the City Council meeting of October 24, 1968, the Council passed an ordinance expressing its desire to hire a sewer consultant to make a comprehensive study of the City's sewer problems. The City has not undertaken a study as yet pursuant to this resolution calling for a comprehensive sewer study.

At the October 24 meeting, the Council approved a resolution setting forth findings of fact and reasons for the adoption of the ordinances in the Martin Road area. Some of the reasons giv-

3.
### ZONING ORDINANCE AMENDMENT
### CITY OF LACKAWANNA

WHEREAS, the present sewer facilities, including the treatment facilities of the City of Lackawanna have been and are overtaxed, and

WHEREAS, the said facilities are in need of improvement, repair and maintenance because of such use, mandated requirements recently enacted by the state authorities, and

WHEREAS, the said need has principally occurred because of the growth of the City of Lackawanna, demand by the Buffalo Sewer Authority to provide its own sewer facilities, besides compliance with additional state requirements, and

WHEREAS, because of such circumstances, raw sewage is being discharged instead of being properly treated, thereby creating further menace to the public health, safety and welfare, and

WHEREAS, it appears provident and imperative that new housing, particularly new subdivisions, be restrained until these sewer facilities of the said City of Lackawanna are improved so as to meet present and future needs safely, thereby maintaining the health, welfare and safety of the public, therefore,

BE IT ENACTED by the City Council of the City of Lackawanna, New York as follows:

SECTION 1. That a state of emergency exists in the City of Lackawanna with respect to this problem which makes it imperative that this ordinance shall become effective forthwith.

SECTION 2. No approval of new subdivisions will be granted until this state of emergency terminates in the best interest of the city.

SECTION 3. All existing ordinances, orders, rules and regulations of the City of Lackawanna are hereby repealed insofar as they may be inconsistent with the provisions of this Ordinance.

SECTION 4. It is the intention of the City Council that each separate provision of this Ordinance shall be deemed independently of all other provisions herein, and

SECTION 5. It is further the intention of the City Council that if any provisions of this Ordinance be declared invalid, all other provisions shall remain valid and enforceable.

Dated: Lackawanna, New York,
October 7, 1968.

APPROVED:

(s) MARK L. BALEN

MARK L. BALEN, Mayor

en were: (1) The sewage problems in the entire City, and in particular the third ward area; (2) That a recreation study recommended this area for a park and recreation; (3) That the Army Corps of Engineers has declared the area just south of this area as a flood land area; and (4) Because the Master Plan has earmarked this area for a recreation purpose.

On February 25, 1969 (after this lawsuit was commenced), the Council passed a resolution rescinding both the rezoning and the moratorium ordinances dated October 7, 1968. This rescission was to take effect immediately.

## MAYOR'S REFUSAL TO SIGN SANITARY 5 FORM

Almost one year after the commencement of this lawsuit and approximately eight months after the City Council rescinded the October, 1968 ordinances, Mr. Will Gibson, attorney for K.P.H.A., C. P.C.P.O., and the two individual plaintiffs, sent a letter to John W. Condon, attorney for the defendants, requesting that a Sanitary 5 form and certain plans to construct a waste disposal system for the proposed subdivision be submitted to Mayor Balen for approval. On November 13, 1969, the Sanitary 5 form was forwarded to the mayor. The next day, all of the parties appeared in this court, and the court directed the Corporation Counsel for the City and defendants' counsel to advise the court within two weeks of the action taken by the mayor in regard to the Sanitary 5 form.

When Mayor Balen received the Sanitary 5 form, he contacted Mr. Vito Caruso from the consulting engineering firm of Nussbaumer & Clark and requested an opinion regarding the advisability of signing this Sanitary 5 form. Nussbaumer & Clark is a consulting engineering firm which has supervised sewer work for the City of Lackawanna for many years, and Mr. Caruso has been active in recent years in the Dorrance Avenue sewer project where the Lackawanna sewers are being disconnected from the Buffalo Sewer Authority. Although his knowledge of other sewers in Lackawanna was limited, within a week Mr. Caruso conducted a visual inspection of the Martin Road sewer situation, reviewed the Sanitary 5 form and the supporting data, and finally concluded that the sewers were inadequate for a new subdivision. He was not asked, nor did he consider, whether or not there was an alternative to an outright refusal to sign the Sanitary 5 form. He reported to the mayor that the sewers were inadequate for a new subdivision. The mayor refused to sign the Sanitary 5 form and this fact was reported in open court on November 28, 1969.

During this period another incident occurred which highlighted the fact that a "sewer crisis" was not the real reason for opposition to the K.P.H.A. undertaking. For a number of reasons, the Buffalo Baseball team was forced to terminate use of its Buffalo stadium. Because of this, during the fall of 1969 the Baseball Club was seeking a stadium to use for about five years, at which time it expected to be able to play in a new stadium.

Mayor Balen proposed to the Baseball Club that the Lackawanna Stadium on South Park Avenue be expanded, at a cost of about $500,000, to provide a temporary baseball park. This stadium is located about five and a half blocks from the K.P.H.A. site in the third ward and is part of the Lackawanna sewer system. The revamped stadium would accommodate about 7,000 additional patrons, but no thought was given to sewer problems or was Mr. Caruso ever consulted about it.

Mayor Balen made a special trip to New York to consult a bonding attorney. However, nothing came of these efforts since the proposal was defeated at a public referendum.

## THE DISCRIMINATORY ACTIONS OF THE DEFENDANTS VIOLATED PLAINTIFFS' CONSTITUTIONAL AND STATUTORY RIGHTS

The plaintiffs seek relief in this case by asserting causes of action under

694

the Fourteenth Amendment (the Equal Protection Clause), the Civil Rights Act (42 U.S.C. § 1983), and the Fair Housing Act of 1968 (42 U.S.C. § 3601 et seq.). The cause of action created under each of these statutes or the amendment proscribes discriminatory conduct because of race or color.

The Fair Housing Act of 1968 covers discriminatory conduct in fair housing situations by both public and private alleged wrongdoers. However, the nature of the discrimination proscribed under the Fair Housing Act is limited in that it does not include discrimination based on poverty. Under Section 1983 and the Fourteenth Amendment, the full range of discriminatory conduct is proscribed if, and only if, that action is taken by a party acting under color of state law. In other words, private discrimination is not actionable under Section 1983 and the Fourteenth Amendment.

Because this lawsuit deals specifically with an allegation of discrimination in housing based on race or color by wrongdoers acting under color of state law, the differences between the various sections and amendment are unimportant.

As long ago as Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917), the Supreme Court pointed out that the Fourteenth Amendment does not allow conduct which results in racially discriminatory treatment, even though the purpose of the municipal action was to preserve the public peace and public welfare, a goal which represented a valid exercise of the police power. Furthermore, a long line of cases in the Supreme Court dealing with equal protection of the laws has held that racial discrimination may be established either by proof of purpose or effect. See Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) and, more recently, Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), and Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969). "It is of no consolation to an individual denied the equal protection of the laws that it was done

in good faith." Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961). Requirements which appear neutral on their face and theoretically apply to everyone, but have the inevitable effect of tying present rights to the discriminatory pattern of the past, are unlawful. United States v. Louisiana, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965). The official act may not place a special burden upon the minority. Gaston County, N. C. v. United States, 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969).

Judicial inquiry into the purpose or effect of governmental action is not limited to the moment that that action occurs. Not only must the "immediate objective" of governmental action be considered, but the "historical context" and "ultimate effect" of such action must be considered as well. Reitman v. Mulkey, *supra*. The inquiry must further assess the "reality" of the "law's impact" and consider the "background" against which state action operates to determine that reality. Hunter v. Erickson, *supra*. Therefore, relevant to this inquiry are either past or prospective governmental actions which form a part of the background.

The history of Lackawanna is that of a racially separate community. Only a handful of blacks ever lived in the second or third ward. The increased white population of the third ward is due substantially to the recently constructed subdivisions which were approved by the City over the last ten years. These approvals were granted in spite of the City's awareness of the sewer problems and the desire of its citizens for increased park and recreation areas. Private discriminatory conduct was well known to City officials. The attempts by Negroes to move into the third ward are accompanied by instances of evasion and refusal by contractors, home owners, realtors, and subdividers. In 1968, a more dramatic example of the private sentiment against the proposed K.P.H.A. subdivision is the petition sent to Bishop McNulty.

The actions of the Planning and Development Board during 1968, taken independently and in conjunction with the Zoning Board of Appeals, and the consequent action of the City Council in October, 1968, indicate to the court that the Lackawanna City officials attempted to respond to the discriminatory sentiments of the community.

One example of this racially motivated response is the Planning and Development Board's demand that the area north of Ridge Road in the first ward be used partly for residential purposes. The prior Planning and Development Board followed the recommendation of the planner not to use this area for residences. However, in spite of the detailed warnings of Mr. Kane, the new board reversed the former position and determined that this area be used for residential purposes, preferably apartments. The result of this decision would be to accelerate the pattern of segregation. Of all of the alternatives presented to the Planning Board, the City chose the one which would minimize the first ward Negroes' opportunity to move to the better conditions of the third ward.

The evidence shows that the actions of the Planning and Development Board were taken specifically to block the K.P.H.A. subdivision. It was not until rumors began about the K.P.H.A. subdivision that the Planning and Development Board discussed the "sewer crisis" and the flood report, but their discussion and resolution of these problems show that they did not attempt to consider the facts developed in these reports in a rational manner but instead used both the "sewer crisis" and the flood report as clubs to defeat the K.P.H.A. proposal. At the same time, they were adopting the resolution which would keep population density levels low in the third ward—the best place to live— and high in the first—the worst place to live.

Discriminatory reasons guided the action of the City Council in its enactment of the October ordinances. It is true that the Council cited a number of reasons for their passage, but the main reasons given—sewer needs, park and recreation needs, and flooding problems —were clearly wrong on the facts and, under the circumstances, mere rationalization. For example, a finding that the park study specifically recommended this area rezoned as a park and recreation area is false. The fact is that the report of the N.R. & P.A. recommended only the area south of Martin Road and west of the proposed McKinley extension as a park area. The finding of fact that the original and the present Master Plan both earmarked the area known as "south of Martin Road" as a recreation area is false. The fact is that both plans and the supporting documents recommended the area south of Martin Road both for recreational and for residential purposes. The Master Plans and supporting reports recommended the area where K.P.H.A. wants to build a subdivision for a residential purpose.

Further, the mayor's action in refusing to sign the Sanitary 5 form, when considered in the "historical context," can only lead to the determination that his refusal was based upon discrimination. Admittedly, Mr. Caruso's knowledge of the sewers in this area was limited; his inspection was cursory, and no alternatives to refusal were requested or given.

Therefore, considering all of the evidence and especially the actions of the City in 1968 and 1969 in their historical context, the court concludes that the plaintiffs have met their burden of showing a denial of equal protection of the law. Affirmative acts were taken under color of law to inhibit the plaintiffs' constitutional and statutory rights.

*Justification*

The defendants urge that the sewer crisis and the urgent need for park space justify the actions they took with respect to the proposed subdivision. However, the Supreme Court has held that, when the effect of a state action is to place upon a minority group a special

burden or classification, the defendant has a heavy burden of justifying such action. It must show that it is necessary to serve a legitimate governmental interest. McLaughlin v. Florida, 379 U.S. 184, 196, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). It must also be shown that the governmental interest is compelling. Shapiro v. Thompson, 394 U.S. 618, 633–634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

The defendants have failed to meet their burden of proof. First of all, they have never attempted to find out whether it was possible to deal with the sewer problems and park needs without infringing upon plaintiffs' rights. There were alternative courses of action which could have been taken in regard to both of these problems, which would have solved the City's needs and not impaired the rights of the plaintiffs.

There was no justification for rezoning this land for park purposes. The Planning and Development Board had designated it for residential use. No one recommended that it be used for park purposes either before or after the enactment of the ordinance.

In support of their position that the City Council was justified in rezoning the K.P.H.A. area for park and recreation space, the defendants called five recreation experts. The court affords little weight to their testimony. One of them, Mr. Noren, who participated with Mr. Buechner in the preparation of the N.R. & P.A. report and concurred in it, attempted to make a different site recommendation at trial. The other four were never consulted during 1968 before the enactment of the ordinance. Their sole function was to testify at trial. In each case, their recommendation was made considering only the park needs of the community without taking into account the other factors which Mr. Kane considered and discussed with Mr. Buechner.

 The sewer problem did not justify the action taken by the Council in enacting the ordinance, or by the mayor in refusing to sign the Sanitary 5 form. There is no question that preserving the environment and healthful living conditions in the community by providing adequate sewage collection is a legitimate governmental function, but the enactment of the subdivision moratorium was not necessary or compelling and, in fact, could not solve the sewer problem.

Neither the Planning and Development Board nor the Council discussed alternatives to the subdivision moratorium so that the sewer system could be improved and the subdivision completed. For the most part, the board and Council ignored the recommendations made by the City's own expert, except for his suggestion to separate the roof leaders from the sanitary sewers, which work the City began only after the state threatened to cut off financial assistance. They ignored other suggestions completely.

Many third ward and other residents of the City have complained about the sewers for at least the last ten years. Nevertheless, during this period, the City continued to issue subdivision and building permits without facing up to a satisfactory solution to the sewer problem. Defendants' lack of attention not only deprived the plaintiffs of an opportunity for housing, but all Lackawanna residents of an efficient sewer system.

*Defendants Had a Duty to Consider and Affirmatively Plan for the Protection of Plaintiffs' Housing Rights*

This court has already held that the facts warrant a finding that the acts of the defendants were a wilful contrivance to deprive plaintiffs of their housing rights. That alone is sufficient to warrant relief to the plaintiffs, but it must be noted that some discrimination resulted from thoughtlessness or failure on the part of City officials to consider or plan for the housing needs of all Lackawanna residents. The defendants may not escape responsibility by ignoring community needs or by fail-

ing to consider alternative solutions to city-wide problems.

If the plaintiffs are deprived of equal housing opportunity, the result is the same whether caused by open, purposeful conduct, by a subtle scheme, or by sheer neglect or thoughtlessness. Adopting the language of Hobson v. Hansen, 269 F.Supp. 401, 497 (D.C., 1967), the Second Circuit, in Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 931 (2d Cir.1968), held that

> " 'Equal protection of the laws' means more than merely the absence of governmental action designed to discriminate; * * * 'we now firmly recognize that the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme.' "

In Southern Alameda Spanish Speaking Organization v. City of Union City, 424 F.2d 291, 295, 296 (9th Cir. 1970), the court held:

> " * * * [I]t may well be, as matter of law, that it is the responsibility of a city and its planning officials to see that the city's plan as initiated or as it develops accommodates the needs of its low-income families, who usually—if not always—are members of minority groups."

The City officials in Lackawanna have the obligation to consider and plan for all of the citizens in the community. They have an obligation not only to plan for the sewer needs of the third ward citizens, but also the housing problem of the first. Industrial encroachment into former residential areas in the first ward which displaced people from their homes calls for as much attention as sewer backups in the third ward.

## MISCELLANEOUS

 The court rejects the argument of the defendants that plaintiffs, C.P. C.P.O., K.P.H.A., the Diocese of Buffalo, and the individual plaintiffs, do not have standing to bring this suit. All plaintiffs have a personal stake in the out-come of this controversy. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

The court disregards as irrelevant the testimony of Peter Vinolus, attorney for the Lackawanna School Board, that the board is now considering acquiring the land to the west of the K.P.H.A. site for school purposes.

## REMEDY

Because defendants' conduct has denied plaintiffs equal protection of the laws and the Constitution of the United States, and also the rights guaranteed by Title VIII of the Civil Rights Act of 1968, plaintiffs are entitled to relief. "We bear in mind that the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." United States v. Louisiana *supra*, 380 U.S. 154, 85 S.Ct. 822. Therefore, it is the order of this court:

1. That, within ten days after plaintiffs deliver the Sanitary 5 form with accompanying documents to the City of Lackawanna, it be executed by an appropriate official and forwarded to the Erie County Department of Health for future action.

2. That, if the Sanitary 5 form is disapproved by the Erie County Department of Health, defendants shall immediately take whatever action is necessary to provide adequate sewage service to the K.P.H.A. subdivision.

3. That defendants be enjoined from initiating steps to condemn, appropriate or otherwise acquire the Kennedy Park Subdivision site for use as park and recreation.

4. That defendants be enjoined from using any of the City's municipal powers regarding land use to prevent or interfere with the construction of Kennedy Park Subdivision.

5. That defendants affirmatively take whatever steps are necessary to allow the Kennedy Park Subdivision to begin construction.

6. That defendants be enjoined from issuing building permits for any construction in the second and third wards which will contribute additional sanitary sewage to the municipal system until Kennedy Park Subdivision has been granted permission to tap into the sewer system by the appropriate authority.

7. That defendants report to the court, the United States and the private plaintiffs what steps the City has taken to allow the connection of Kennedy Park Subdivision into the municipal sewer system; what problems they have encountered; and what they are doing about those problems. That, if appropriate and necessary, the court shall set a timetable for such reports.

8. That this court retain jurisdiction over this matter until Kennedy Park Homes Subdivision is completed.

9. That this court will defer consideration of the question of damage until a later date, to be fixed by order of the court.

The order of this court shall take effect immediately upon filing and service upon the attorney for the defendants. No stay of this judgment will be granted by this court pursuant to Rule 8(a) of the Federal Rules of Appellate Procedure.

So ordered.