Artie MAHALEY et al., Plaintiffs,

v.

CUYAHOGA METROPOLITAN HOUS-
ING AUTHORITY et al., Defendants.

Dorothy M. HARRISON et al.,
Plaintiffs,

v.

CUYAHOGA METROPOLITAN HOUS-
ING AUTHORITY et al.,
Defendants.

Civ. A. Nos. C 71–251, C 72–67.

United States District Court,
N. D. Ohio, E. D.

Feb. 22, 1973.

James I. Huston, Thomas J. LaFond, Schneider, Smeltz, Huston & Bissell, Cleveland, Ohio, for plaintiffs.

Robert Debevec, Law Director, City of Euclid, Euclid, Ohio, for City of Euclid, Harry J. Knuth, individually and as Mayor of City of Euclid, William H. Bretton, Harry L. Burkhart, Frank J. Chukayne, Edward Eckart, Milan A. Jaksic, Michael Kosmetos, John T. McCormack, Joseph E. Whalen and Stanley R. Zagorc, individually and as members of Council of the City of Euclid.

Loyal V. Buescher, Law Director, City of Solon, Cleveland, Ohio, for City of Solon, William E. Price, individually and as Mayor of City of Solon, John J. Kurpell, John Lechner, Vincent Marek, George C. Nierlich, Ralph Prasek, Albert A. Varga and George Vondrasek, individually and as members of Council of the City of Solon.

Theodore S. Holtz, Law Director, City of Garfield Heights, Garfield Heights, Ohio, for City of Garfield Heights, Raymond A. Stachewicz, individually and as Mayor of City of Garfield Heights, Betty F. Bennet, Frank J. Debelak, Eugene P. Kidd, Joseph Lamatrice, Joseph M. Maley, Edward J. Malley, Ralph Munson and Henry Piwkowski, individually and as members of Council of City of Garfield Heights.

Andrew Boyko, Law Director, City of Parma, Parma, Ohio, for City of Parma, John M. Petruska, individually and as Mayor of City of Parma, Francis E. Dobbins, Mary Dunning, Paul S. Kisil, Evelyn Kopchak, Kenneth G. Kuczma, Victor J. Labutta, Lynn W. Leary, George J. Novicky, Theodore P. Roth, John F. Sands, Jerome P. Stano, Stanley H. Wojas and John J. Zielinski, individually and as members of Council of City of Parma.

Robert Senor, Cleveland, Ohio, for City of Westlake, Alexander R. Roman, individually and as Mayor of City of Westlake, Ebert W. Berndsen, William Corley, Elmer P. Mang, Morton Nemet, William P. Skelly, Samuel B. Walls and James L. Wells, individually and as members of Council of City of Westlake.

Robert Bauer, U. S. Atty., for Department of Housing and Urban Development of United States, George Romney, as Secretary of Department of Housing and Urban Development of United States.

Nick DeVito, Asst. Law Director, Richard Hollington, Jr., Law Director, Ralph J. Perk, Mayor of the City of Cleveland, Frances Panehall, Joseph A. Lombardo, Michael J. Zone, Frank E. Gaul, Michael L. Climaco, Theodore E. Sliwa, Dennis Kucinich, Margaret McCaffery, Richard M. Harmody, William Franklin, James H. Bell, Charles V. Carr, individually and as members of Council of City of Cleveland, Walter C. Kelley, Jr., Fred J. Livingstone, Cleveland, Ohio, for Alfred I. Stolz, Robert E. Sweeney, Msgr. Francis W. Carney, Bertha Falkowski and Gwendolyn Hall, members of the Board of Cuyahoga Metropolitan Housing Authority, Robert J. Fitzgerald, Executive Director of Cuyahoga Metropolitan Housing Authority, City of Cleveland.

Before CELEBREZZE, Circuit Judge, BATTISTI, Chief Judge, and LAMBROS, District Judge.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge:

These are consolidated suits instituted pursuant to 42 U.S.C. § 1981 and § 1983 and arising under federal law invoking this court's jurisdiction pursuant to 28 U.S.C. §§ 1343(3), 1343(4) and 1331(a). They are brought in behalf of all tenants and applicants for low-income housing, the vast majority of whom are Negro, and the Path Association, a nonprofit corporation incorporated under the laws of the State of Ohio whose principal purpose is to stimulate the improvement of housing and related neighborhood conditions in the Greater Cleveland Metropolitan Area. The defendants are the Cuyahoga Metropolitan Housing Authority, which is a public corporation created under Section 3735.-27 et seq. of the Ohio Revised Code and

is authorized, inter alia, to engage in the development and administration of low rent housing in all areas of Cuyahoga County, except Chagrin Falls Township. Defendant Fitzgerald is the Director of defendant Cuyahoga Metropolitan Housing Authority. The members of the Board of CMHA are parties defendant in their official capacities. The defendant suburban cities in C 71–251, Euclid, Garfield Heights, Parma, Solon and Westlake (suburbs) are all municipal corporations within Cuyahoga County, established under the laws of the State of Ohio; all but Parma are chartered. The respective Mayors and Councilmen of the defendant suburbs are also parties defendant. The defendants in C 72–67 are the City of Cleveland, its Mayor, and its Councilmen. The defendant Department of Housing and Urban Development of the United States (HUD) is created under the laws of the United States and administers the federal low rent public housing laws. Defendant Romney is the Secretary of HUD and its chief executive official.

The plaintiffs are seeking a declaration that 42 U.S.C. § 1415(7)(b)(i) is unconstitutional on its face or as it has been applied. The named plaintiffs in C 71–251 are two Negroes and one White citizen of the United States who require low rent public housing for their health, safety and welfare. They represent a class of low-income residents of the Greater Cleveland Area, who by virtue of their poverty, or race, or both, are unable to secure decent, safe and sanitary housing at rents they can afford without the assistance of CMHA. The plaintiffs contend that the local consent requirement of 42 U.S.C. § 1415(7)(b)(i) permits and encourages the governing bodies of local municipalities to control the acceptance of low rent housing and has directly led to the containment of low rent housing into areas, almost entirely within the City of Cleveland, which are predominately Negro, in violation of the Fifth, Thirteenth and Fourteenth Amendments to the United States Constitution. In Count Two of C 71–251 the plaintiffs contend that the

defendant suburban cities have declined to enter into Cooperation Agreements with CMHA in an attempt to perpetuate discrimination in housing patterns, which would concentrate Negroes largely within the City of Cleveland.

The named plaintiffs in C 72–67 are Negro tenants or applicants for CMHA public housing. Counts One and Two are substantially identical to their counter parts in C 71–251. Count Three of this complaint alleges that the number of units agreed to in the Cooperation Agreement of 1971 between the City of Cleveland and CMHA is inadequate to meet the needs for low income housing in Cleveland. Therefore, the plaintiffs pray that judgment be entered declaring that the failure of defendant councilmen to execute a "meaningful" Cooperation Agreement is in conflict with the plaintiffs' rights secured by the Fourteenth and Thirteenth Amendments, and that this court issue an order directing that CMHA and the City of Cleveland enter into a new Cooperation Agreement which more properly reflects low income housing needs.

42 U.S.C. § 1415(7)(b) provides:

"The Authority shall not make any contract for loans (other than preliminary loans) or for annual contributions pursuant to this chapter with respect to any low-rent housing project initiated after March 1, 1949

(i) unless the governing body of the locality involved has entered into an agreement with the public housing agency providing for the local cooperation required by the Authority pursuant to this chapter."

The Department of Housing and Urban Development upon the application of a local public housing agency may provide federal assistance for the acquisition or construction of low rent housing designed to meet unsatisfied housing needs. 42 U.S.C. § 1401 provides, in pertinent part:

"It is declared to be the policy of the United States to promote the general welfare of the Nation by employing

its funds and credit, as provided in this chapter, to assist the several States and their political subdivisions to alleviate present and recurring unemployment and to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income . . . that are injurious to the health, safety and morals of the citizens of the Nation."

Specifically, the Secretary of HUD is authorized to make loans "to public housing agencies to assist the development, acquisition, or [the] administration of low-rent housing." 42 U.S.C. § 1409. The Secretary may also make annual contribution contracts with local public housing agencies to ensure the low-rent character of housing projects which are federally assisted. 42 U.S.C. § 1410(a). While preliminary loans are designed, in effect, to permit the local public housing agency to develop and initiate plans of acquisition for low-rent housing, annual contributions are intended to assist the agency in amortizing its bond indebtedness, which may be incurred in the actual costs of construction and land acquisition. 42 U.S.C. §§ 1409, 1410.

The low rent housing program is based upon the determination of local agencies, as demonstrated to HUD, that there exists a need for low-rent housing in the locality concerned "not being adequately met by private enterprise". 42 U.S.C. § 1415(7)(a). The responsibility for this assessment rests jointly with the local community and the local housing authority. If applicable federal requirements are satisfied, the Department of HUD may upon the application of the local public housing agency provide federal assistance by means of loans and annual contributions.

In its enactment of the United States Housing Act of 1949, 42 U.S.C. § 1401 et seq., the Congress expressly conditioned the provision of federal assist-

ance either by preliminary loan or annual contributions upon the local public housing agency having entered into a local Cooperation Agreement with the governing body of the locality in which low-rent housing was to be acquired or constructed. 42 U.S.C. § 1415(7)(a), (b). The local Cooperation Agreement ensures that the low-rent character of federally assisted housing will be exempt from otherwise applicable State and local taxes (42 U.S.C. § 1410(h)), and that the provision of additional dwelling units under the program will result in corresponding elimination or improvement of unsafe or insanitary dwelling units situated in the locality. 42 U.S.C. § 1410(a).

The plaintiffs contend that the requirement of 42 U.S.C. § 1415(7)(b)(i) is unconstitutional both on its face and as it has been applied by the suburban defendants and the City of Cleveland. These will be examined seriatim.

The plaintiffs contend that the Cooperation Agreement requirement of local consent on its face violates the due process clause of the Fifth Amendment to the United States Constitution.[1]

 It is clear that not all statutory classifications are violative of equal protection as guaranteed by either the Fifth or Fourteenth Amendments. In 1970 in Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970), the Supreme Court stated:

"In the area of economics and social welfare, the State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality'. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78 [31 S. Ct. 337, 55 L.Ed. 369] . . . 'A statutory discrimination will not be

---

1. The plaintiffs' arguments based on freedom of movement and unlawful delegation are rejected.

set aside if any state of facts reasonably may be conceived to justify it.' McGowan v. Maryland, 366 U.S. 420, 426 [81 S.Ct. 1101, 6 L.Ed.2d 393]." The argument which assumes that the constitutional guarantee of equal protection is not violated merely because a statute authorizes one citizen to be treated differently than others, is of course, subject to the qualification that the statute does not establish an invidious discrimination. In addition the argument does not reach the question of whether an otherwise constitutional enactment is being applied in an unconstitutional manner.

■■ Equal protection, absent an invidious discrimination, requires only that a Congressional enactment have some reasonable relation to a statutory objective or purpose. This statute is certainly not arbitrary, or capricious and has a rational basis. This consent requirement was provided to ensure that low-rent housing would be coupled with the slum clearance provisions of the Act, and to buttress the notion of cooperative federalism.

The plaintiffs have not shown that the requirement of 42 U.S.C. § 1415(7)(b) (i) is based on a suspect category or affects fundamental rights. On its face this requirement does not discriminate on the basis of race. Moreover, it does not establish an invidious discrimination based upon wealth. While it is true that local consent is required only under the federal housing program for the poor, this does not, ipso facto, establish an invidious discrimination. Under some circumstances legislative enactments which have discriminated on the basis of wealth have been struck down. Edwards v. California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941) invalidated a state law which made it a crime for an individual to assist an indigent in entering the State. The criminal law has eradicated those enactments which denied appellate review solely on the grounds of the defendant's inability to afford a transcript, Griffin v. Illinois, 351 U.S. 12, 76 S. Ct. 585, 100 L.Ed. 891 (1956), and a state law which left to the discretion of the appellate court whether indigents would be provided counsel on appeal. Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). Other cases which have held that wealth has constituted a suspect classification include Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L. Ed.2d 169 (1966) (Poll tax) and Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (Prepayment of costs in divorce actions).

These cases, however, must be read in light of James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971). The plaintiffs, who were eligible for low cost public housing, challenged the requirement of Article XXXIV of the California Constitution, which provided that no public housing project could be developed, constructed or acquired by any State public body, until approved by a majority of voters in the locality in which the proposed development was to be located. The Supreme Court found that Article XXXIV did not, on its face, involve the suspect category of race, since it applied to all low rent public housing projects, and that since it was supported by a rational basis, the provision was sustained. The court held that the evidence before it did not support the claim that while the law was seemingly neutral on its face, it in fact was aimed at a racial minority. While emphasizing and recognizing the California tradition of housing referenda which provide ". . . citizens a voice on questions of public policy." 402 U.S. at 141, 91 S.Ct. at 1333, the opinion of the court does seem to indicate that wealth, per se, is not a suspect classification in the context of the constitutional examination of a provision relating to housing assistance or welfare. See Jefferson v. Hackney, 409 U. S. 898, 93 S.Ct. 178, 34 L.Ed.2d 156 (1972); English v. Town of Hunting-

ton, 448 F.2d 319 (2d Cir. 1971); Cf. Chidsey v. Guerin, 443 F.2d 584 (6th Cir. 1971).

The plaintiffs contend that their fundamental rights have been violated. They do not contend that there is a right to safe and sanitary housing, Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972), but rather that there is a fundamental right to housing outside the inner city. Those interests which have been characterized as fundamental are quite few. To date the right asserted here has not been elevated to the level of a fundamental right. However, simply categorizing housing as a basic human need is not sufficient to call for application of strict judicial review outside of the carefully designed parameters which the Supreme Court has set for fundamental rights.

In spite of this it can not be denied that only the federal housing subsidies, which are directed at low income people, require any kind of local consent. The direct result of this is that whenever a suburban city refuses to sign a Cooperation Agreement, the bulk of poor persons residing in a nearby urban center will be effectively excluded from residence in that suburb. While it is true that if the federal low rent housing law specifically provided that Negroes could not live in White neighborhoods, there would be no question as to the unconstitutionality of such an enactment, Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), that case is not before the Court. The result of Section 1415(7)(b)(i) is not necessarily racial discrimination. The racial effect of this statute, if any, is not caused by the statute itself but rather by municipal action or inaction which may have used this provision as a shield to protect its inhabitants from integration by low income Negroes.

The argument which the plaintiffs have presented assumes that merely because low income Negroes do not live in the defendant suburban cities, the statute has established suspect classifications which have caused this result. The plaintiffs have not shown such a cause and effect relationship. It is true that recent Civil Rights Acts have insisted that no person should be denied the benefits of any federally assisted program on the basis of race, color or national origin. 42 U.S.C. § 2000d (1964). The Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq., established a national policy against discrimination in the sale or rental of housing. As a result of these enactments, HUD has been charged with the responsibility of guaranteeing that projects assisted by it do not foster racial segregation. Hicks v. Weaver, 302 F.Supp. 619 (E.D.La.1969); Shannon v. HUD, 436 F.2d 809 (3rd Cir. 1970). This national policy of integration in housing patterns is not *necessarily* inconsistent with state cooperation. While the requirement of local cooperation may be at least partially inconsistent with the new policy of HUD, that does not, per se, establish a suspect classification on either racial or economic ground. Therefore, it seems that this law is neutral on its face. However, it may have been manipulated improperly.

■ Having determined that 42 U.S. C. § 1415(7)(b) is constitutional both on its face and as applied, we find no further questions which are required to be heard by this three judge court. The question of whether the defendants' conduct violated the provisions of 42 U.S.C. § 1983 is not a proper matter for a three judge court. Therefore, without reaching any determination of the merits of Count Two of each complaint, this court remands consideration of those claims to Chief Judge Frank J. Battisti. Metcalf v. Swank, 293 F.Supp. 268 (W. D.Ill.1968); See Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971).

Therefore summary judgment shall enter for the defendants on Count One of each complaint. The three judge panel is dissolved and the remainder of these consolidated cases are remanded to the

judge to whom the case was originally assigned, Chief Judge Frank J. Battisti.

It is so ordered.

LAMBROS, District Judge (dissenting).

I dissent from the decision to remand this case to Chief Judge Battisti for his ruling as a single judge on the claim of racial discrimination and from the decision that the Local Cooperation Agreement requirement in 42 U.S.C. § 1415(7)(b)(i) is constitutional.

The dissolution of the three-judge court is not justifiable either from the point of view of judicial economy or the orderly disposition of this case. The three-judge court has already heard the evidence relating both to the claim that the statute is unconstitutional and the claim that defendants discriminated. Therefore, the dissolution of the three-judge court after the ruling on the constitutionality of the statute and prior to ruling on the claim of racial discrimination does not result in a timesavings. See Perez v. Ledesma, 401 U.S. 82, 90, 91 S.Ct. 674, 27 L.Ed.2d 701 (Stewart concurring); Florida Lime and Avocado Growers, Inc. v. Jacobsen, 362 U.S. 73, 84, 85, 80 S.Ct. 568, 4 L.Ed.2d 568 (1960). Moreover, this case could have been decided in a more orderly fashion without dissolution. The practice of avoiding rulings on the constitutionality of a federal statute where relief can reasonably be granted without reaching that question is one consistently sanctioned by the Supreme Court. United States v. Thirty-Seven Photographs, 402 U.S. 363, 369, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932). In this case, it is possible that the relief requested could be granted upon a finding of discrimination without reaching the question of the constitutionality of the statute. However, this orderly disposition was precluded by the decision to rule on the constitution-

ality of the statute first and then remand the remainder.

In dissenting from the dissolution of the three-judge court, I will present my findings concerning the claim of discrimination because I think this may be the only question which the three-judge court should have reached. However, since the Court has ruled that the Local Cooperation Agreement requirement is constitutional, I will also comment on the inadvisibility of broadening the doctrine of James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971), to uphold that statute.

## I. INVIDIOUS DISCRIMINATION BY SUBURBS *

### A. THE TEST

Under the equal protection clause of the Fourteenth Amendment to the Constitution and the Civil Rights Acts, state and municipal officials are prohibited from acting with the intent of perpetuating patterns of racial discrimination in housing. Reitman v. Mulkey, 387 U.S. 369, 380, 381, 87 S.Ct. 1627, 18 L.Ed. 2d 830 (1967); 42 U.S.C. § 1983. Since the officials seldom admit publicly that their acts are racially motivated, the courts have developed methods to test certain acts or refusals to act in order to determine whether discriminatory intent exists.

In particular the courts have examined, first, whether the act has a racially discriminatory effect and, second, whether there is legitimate nonracial explanation for the act. In Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), for example, the Court emphasized the need to examine the potential impact of an ordinance which mentioned race but appeared to be neutral rather than discriminatory on its face and for which there was no general legislative purpose. At least five circuits have adopted the principle that, even though an act is seemingly neutral on its face and does not mention race, if

---

* I find no basis upon which to order relief and therefore would dismiss the case as to defendant City of Cleveland.

## 1252

it results in housing discrimination and if the officials fail to give a reasonable nonracial reason for it, the act constitutes invidious discrimination in violation of the Fourteenth Amendment. Dailey v. City of Lawton, 296 F.Supp. 266 (W.D.Okl.1969), aff'd 425 F.2d 1037, 1039, 1049 (10th Cir. 1970); Crow v. Brown, 332 F.Supp. 382 (N.D.Ga.1971), aff'd 457 F.2d 788 (5th Cir. 1972); Kennedy Park Homes Association v. City of Lackawanna, 318 F.Supp. 669 (W.D. N.Y.), aff'd 436 F.2d 108 (2d Cir. 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); Hawkins v. Town of Shaw, Mississippi, 437 F.2d 1286 (5th Cir. 1971); Banks v. Perk, 341 F.Supp. 1175 (N.D.Ohio 1972), aff'd 473 F.2d 910 (6th Cir. 1973); Southern Alameda Spanish Speaking Organization v. City of Union City, California, 424 F.2d 291, 295–296 (9th Cir. 1970); Gautreaux v. Chicago Housing Authority, 342 F.Supp. 827, 829 (N.D.Ill.1972). The importance of this doctrine is aptly demonstrated by the situation here presented.

### B. ACTION OR INACTION

The defendant suburbs urge the Court to characterize their refusal to negotiate the Local Cooperation Agreement, which is a prerequisite to federal funding for low income housing under 42 U.S.C. § 1415(7)(b)(i), as mere inaction which it claims could not be discriminatory. However, it is unnecessary to rule on the question of whether municipal inaction can be reached under the Fourteenth Amendment because the refusal in this case clearly constitutes affirmative action. See Hawkins v. Town of Shaw, Mississippi, 461 F.2d 1171, 1173 (5th Cir. 1972).

The action required of the defendant suburbs was not actual spending and construction, as would be the case, for example, in the failure to build a school. All that was needed was the approval for the plans made by defendant CMHA

and financed by the federal government. Furthermore, the defendant suburbs were pressed on numerous occasions for their decision in this regard. That they viewed their withholding of the Local Cooperation Agreement and negotiations related thereto as affirmative action is evident by remarks by officials in defendant Parma. There, both the Mayor and President of Council spoke of the need to exclude public housing and, in the case of the President of City Council, to keep blacks from moving into the suburb by way of public housing.

In other words, the refusals of defendant suburbs to negotiate a Local Cooperation Agreement were not within the analogy of one who walks past a drowning person but were more akin to the analogy of one who holds a life preserver over a drowning person and, upon consideration, decides not to drop it. See C. Black, State Action, Equal Protection and California's Proposition 14, 81 Harv.L.Rev. 69, 73 (1967). The defendant suburbs who could have effortlessly permitted the development of low income public housing but preferred to prevent it must be said to have acted affirmatively. See Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967).

### C. RACIAL DISCRIMINATION

A brief examination of existing housing patterns and the racial characteristics of plaintiffs and defendant suburbs demonstrates the discriminatory effect of the defendant suburbs' refusals to negotiate. Cuyahoga County is segregated racially, with ninety-seven per cent of its black population residing in four municipalities. The defendant suburbs are examples of the more than fifty municipalities predominately populated by whites which surround the black population. Four of the defendant suburbs are 99.1 to 99.8 per cent white, with the fifth suburb being 95.5 per cent white.[1]

---

1. Garfield Heights is 95.4 per cent white. However, all but two of its black residents live in an area adjacent to the

City of Cleveland. These figures are based on the 1970 census.

Plaintiffs, who are seeking to live in defendant suburbs, are predominately black. In 1971, 86 per cent of the applicants for family units were black and 73 per cent of applicants for both elderly and family units were black. The defendant suburbs' refusals to negotiate a Local Cooperation Agreement thus have had the effect of preventing integration of the defendant suburbs through the location of public housing in these suburbs.

Defendant suburbs should have, in light of existing housing segregation and the fact that plaintiffs are predominately black, realized that their refusals would have a racially discriminatory effect. However, they did not advance an explanation for such refusals but merely claimed that the refusals were not solely racially motivated.

In contrast, the plaintiffs did not rest their case on the racially discriminatory effect of the refusal and the lack of explanation. They further showed that there was not a plausible nonracial reason for defendant suburbs' refusals. In particular, they showed that a need for low income public housing existed and that it was not reasonable to assume, without negotiation, that the construction of low income public housing would result in a loss in revenues to the suburban community permitting it.

1. *Need.* The need for housing must, under a 1968 Executive Order for racially scattered site housing, be determined on a metropolitan basis. 24 C.F.R. Ch. II, Part 200N. Using the scattered site definition of need, the Cleveland City Planning Commission fixed a need for the County and listed the number of units, varying between 158 and 2105, needed within each of the defendant suburbs. That testimony was substantiated by the fact that approximately 5600 qualified persons are presently on the waiting list for low income public housing and that many of these persons prefer suburban locations.

Assuming for purposes of argument, however, that need must be determined within each suburb, the plaintiffs still were able to show that the need existed. They presented expert testimony to the effect that numerous welfare recipients already living within each suburb were unable to afford adequate housing.

2. *Loss or Gain in Revenues.* Under both state and federal statutes, low income public housing is exempt from state and local taxes. 42 U.S.C. § 1410(h); Ohio Rev.Code § 3735.34. In lieu of taxes, the housing project pays 10 per cent of its shelter rents to the taxing authority. *Id.* The public housing projects must, under federal statute, pay the municipality for all services at the same rate as private housing projects. 42 U.S.C. § 1410(i).

The tax loss or gain to the municipality as the result of low income public housing located there will therefore depend on the difference between 10 per cent of the shelter rents and the taxes which would have resulted from an alternative use of the land in question. When, without the public housing, the land would be undeveloped, would be used for a church, street or other tax exempt function, or would be less effectively developed, the municipality would gain revenues as the result of a low income development. Thus, for example, the CMHA developed properties in Cleveland yielded higher revenues after their development than had those properties prior to development.

Because the loss or gain is dependent on so many variables, it is not possible to determine whether a net loss would result without first negotiating with regard to specific parcels of land and specific kinds of housing projects. Thus, the prospect of loss of revenue in this case could not have motivated the defendant suburbs to refuse to negotiate toward the signing of a Local Cooperation Agreement.

The defendant suburbs have not admitted that their refusals to negotiate are racially motivated. However, the situation presented is a clear case of housing discrimination. While there are

a few white prospective tenants and a fraction of a percentage of blacks within defendant suburbs, the situation is significantly one of white versus black. The defendant suburbs have repeatedly refused not only to sign a Local Cooperation Agreement but even to negotiate with defendant CMHA. They have not only failed to state compelling reasons for such a refusal; they have refused to give any reason. Moreover, it appears that no plausible non-racial reason exists.

## D. STATE ACTION

I have made a finding of racial discrimination. However, in order to bring the discrimination of defendant suburbs within the Civil Rights Act, 42 U.S.C. § 1983, it is also necessary to find that the officials acted under color of state or local law. District of Columbia v. Carter, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973). It is necessary, therefore, to deal with defendants' contention that their acts were sanctioned by the federal statute requiring a Local Cooperation Agreement prior to funding, 42 U.S.C. § 1415(7)(b)(i), rather than by local law and thus not within the purview of § 1983. The major error with this contention is that it rests on the interpretation of § 1415(7)(b)(i) when it was passed in 1949 rather than the interpretation which must be followed today after subsequent legislation and court decisions in the civil rights field.

As a general rule, when a federal statute conflicts with later legislation or with judicial interpretations of the Constitution, the courts are under a duty to construe the statute in light of prevailing law, where fairly possible, so that it may be preserved. United States v. Thirty-Seven Photographs, 402 U.S. 363, 369, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932). In this case, the major legal development since the 1949 enactment of § 1415(7)(b)(i) has been the creation of

an affirmative duty to promote racial integration on the part of the federal government.

In 1949 the federal government had no legal duty to promote racial integration. The federal authorities were then permitted to stand by while segregation was perpetrated by others. Bradley v. School Board of City of Richmond, Virginia, D.C., 338 F.Supp. 67, 217, rev'd on other grounds 462 F.2d 1058 (4th Cir. 1972). In fact, until 1962 federal officials did not object when local public housing authorities planned developments on a racially segregated basis. 338 F.Supp. at 219.

Since 1949, the Court has ruled that local governments may not encourage the continuation of patterns of racial segregation. Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969). Furthermore, under the Fair Housing Act of 1968 and the amendment to programs of federal assistance in 1964, the federal government has an affirmative duty to foster and plan integrated housing. 42 U.S.C. §§ 2000d et seq., 3601 et seq.; Shannon v. HUD, 436 F.2d 809, 816 (3d Cir. 1970); Crow v. Brown, 332 F.Supp. 382, 390 (N.D.Ga. 1971), aff'd 457 F.2d 788 (5th Cir. 1972); Gautreaux v. Romney, 448 F.2d 731, 735–741 (7th Cir. 1971).

Thus, if § 1415(7)(b)(i) is read to preserve it in light of the changes and amendments by implication, it would sanction only a refusal to negotiate a Local Cooperation Agreement which was nonracial in character and which is consistent with the duty to foster integration. Under its present interpretation it could not and does not sanction the defendant suburbs' racial discrimination. Thus, the defendant suburbs' refusals were under their authority as local officials and therefore under color of state law so as to be within the purview of § 1983.

## E. CONCLUSION

The evidence here shows that the defendant suburbs, acting under color of

local law, have refused to negotiate the signing of a Local Cooperation Agreement. Their refusals have had the effect of preventing the construction of badly needed housing for the predominately black applicants who seek residence away from the squalor of the central city. In face of the tragic effect of the defendant suburbs' refusals to negotiate, they have advanced no legitimate nonracial reason and, from the evidence presented, it appears that none exists.

The effects of racial segregation are destroying the community. The predominately black inner city is becoming a concentration of high crime and poor schools. If the Court permits acts such as those of the defendants in this case to block any progress in alleviating the ghetto, it will, in effect, license all those who are able to erect political barriers between themselves and the ghettos a few blocks away to practice housing discrimination under the guise of local autonomy and to perpetuate the racial division of our community. For the reasons stated above, I would rule that defendant suburbs, under color of local law, have discriminated against plaintiffs on the basis of race in refusing to negotiate the Local Cooperation Agreement which is required under 42 U.S.C. § 1415(7)(b) (i).

## II. CONSTITUTIONALITY OF THE LOCAL COOPERATION AGREEMENT REQUIREMENT

The crucial issue presented by the challenge to the constitutionality of the Local Cooperationg Agreement requirement is the applicability of the doctrine announced in James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971). I believe that the doctrine does not apply to the statute at issue here and should not be broadened to uphold it.

In James v. Valtierra, the Supreme Court upheld the validity of a California constitutional amendment which required a referendum to approve the de-velopment of low income public housing. In so doing, the Court emphasized that it was not dealing with a legislative hurdle required only of low income public housing but rather with a constitutional scheme which required the same legislative hurdle for many other kinds of legislation, several of which were listed by the Court in its opinion. 402 U.S. at 142, 91 S.Ct. 1331. *See also* Sisters of Prov. of St. Mary of Woods v. City of Evanston, 335 F.Supp. 396, 403 (N.D. Ill.1971). The Court stated:

"Furthermore, an examination of California law reveals that persons advocating low-income housing have not been singled out for mandatory referendums while no other group must face that obstacle." 402 U.S. at 142, 91 S.Ct. at 1334.

In contrast, the Local Cooperation Agreement requirement which is at issue here is unique to low income public housing. Those federally-assisted housing programs which are not for low income persons do not require a local approval. *See, e. g.,* 12 U.S.C. §§ 1709(b), (h), (i), (m); 1715e, 1715l, 1715m, 1715n, u, y, z, z-1; and 1713 (federal homeowner mortgage insurance and mortgage subsidy programs); 12 U.S.C. § 1701q (loans for housing for elderly and handicapped); 38 U.S.C. §§ 801, 1810, 1811 (housing subsidies for veterans). The federally-assisted housing programs for low income persons require local approval or a cooperation agreement. 42 U.S.C. § 1421b(a)(2) (leased housing); P.L. 92–383, 86 Stat. 540 (rent supplement); 42 U.S.C. § 3304(b)(1) (city demonstration).

The fact that local approval is required only for low income housing would require even a mildly cynical person to doubt the general legislative purpose of such a requirement. Moreover, when the reasons advanced for the requirement are examined it is evident that, first, the Local Cooperation Agreement is not required to insure that a local determination of need for low income housing is made. In fact, a local public

body, the local housing authority, makes such a determination of need prior to applying for funds. 42 U.S.C. § 1415(7)(b)(ii), (iii). Second, the Agreement is not necessary to the establishment of the tax exempt status provided in the federal statutes. Indeed, such exemption is provided within the Housing Act and reaffirmed by state statute. 42 U.S.C. § 1410(h); Ohio Rev.Code § 3735.34. Third, the slum clearance provisions of 42 U.S.C. § 1410(a) have been largely rendered moot by civil rights legislation and the "scattered site" orders which mean that public housing will more often be located in suburban municipalities where no slums exist. 42 U.S.C. §§ 2000d, 3601 et seq.; 24 C.F.R. Ch. II, Part 200N. Fourth, the Agreement does not insure the consent of the municipality to accept lower payments for municipal services, because the public housing projects must, under federal law, pay for municipal services just as private developers. 42 U.S.C. § 1410(i). Finally, it would be unusual to require the Agreement simply because the receipt of ten per cent of rents paid to by public housing rather than taxes may in some instances result in a loss of revenues. Those developing other tax-exempt land uses, such as churches, federal buildings, and universities, do not sign such an agreement although those uses yield no taxes and no payments in lieu of taxes. Thus, there is no general legislative purpose to justify the Local Cooperation Agreement in this case.

Because low income public housing provides for such a large percentage of blacks when compared with the population as a whole, the added obstacle for low income public housing assists localities not only in excluding low income persons but also in excluding blacks.[2] The frequent use of the requirement of local consent to exclude blacks is evidenced by the cases listed below, in which federal courts found that localities trying to prohibit low income housing had racially discriminatory purposes. Dailey v. City of Lawton, 296 F.Supp. 266 (W.D.Okl.1969), aff'd 425 F.2d 1037, 1039, 1040 (10th Cir. 1970); Crow v. Brown, 332 F.Supp. 382 (N.D.Ga. 1971), aff'd 457 F.2d 788 (5th Cir. 1972); Kennedy Park Homes Association v. City of Lackawanna, 318 F.Supp. 669 (W.D.N.Y.), aff'd 436 F.2d 108 (2d Cir. 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); Hawkins v. Town of Shaw, Mississippi, 437 F.2d 1286 (5th Cir. 1971); Banks v. Perk, 341 F.Supp. 1175 (N.D.Ohio 1972), aff'd 473 F.2d 910 (6th Cir. 1973); Southern Alameda Spanish Speaking Organization v. City of Union City, California, 424 F.2d 291, 295–296 (9th Cir. 1970); Gautreaux v. Chicago Housing Authority, 342 F.Supp. 827, 829 (N.D.Ill.1972).

Because the legislation at issue here does not come within the holding of James v. Valtierra, it is incumbent upon the Court to consider the advisibility of applying the doctrine announced in *Valtierra* to legislation which clearly classifies on the basis of poverty and places an extra legislative hurdle only for those who are seeking low income public housing. I oppose any such broadening of the *Valtierra* doctrine, because I believe that it would render the courts ineffective to enforce the national policy of racial integration.

In the past, enforcement of racial integration has been possible through striking down racial classifications for which there was no compelling state interest. More recently, however, as the result of more subtle means of discrimination being adopted, civil rights enforcement has focused upon statutes or acts in which the group treated differently is described without mentioning race to accomplish discriminatory results. Thus, for example, the southern voting districts replaced racial prohibitions with literacy tests and these were struck down, South Carolina v. Katzen-

2. National Commission on Urban Problems, Building The American City 114 (U.S. Govt. Printing Office 1968).

bach, 383 U.S. 301, 86 S.Ct. 803, 15 L. Ed.2d 769 (1966); Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072; and with voting fees and these were struck down, Harman v. Forssenius, 380 U.S. 528, 543, 544, 85 S.Ct. 1177, 14 L. Ed.2d 50 (1965); and with gerrymandering and this was struck down, Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). Employers replaced racial restrictions with intelligence tests and these were struck down. Griggs v. Duke Power Co., 401 U.S. 424, 431, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In a similar matter, the Local Cooperation Agreement requirement replaced a policy of permitting municipalities to exclude on the basis of race with one permitting exclusion on the basis of poverty—to accomplish the same result.

In conclusion, I agree with the dissenters in *Valtierra* who warned that it is "too late in the day" to treat provisions classifying on the basis of poverty in the housing field as totally benign technical economic classifications which should not be subject to close judicial scrutiny unless applied to areas recognized by the Supreme Court as "fundamental rights" (criminal proceedings, travel, divorce, voting, or privacy). 402 U.S. 145, 91 S.Ct. 1331, 28 L.Ed.2d 678. The integration of metropolitan housing, schools and government cannot effectively be accomplished independently and, although this integration has not been classified as a "fundamental right" by the Supreme Court, it is certainly basic to racial peace and equality. Lindsey v. Normet, 405 U.S. 56, 74, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972). To fail to scrutinize a poverty classification in housing when it is so frequently used to subvert the courts' efforts to enforce the Fourteenth Amendment is to ignore the means used by white suburban communities in this decade to exclude blacks from their exclusive enclaves within the nation's metropolitan areas. Therefore, I would not extend *Valtierra* to uphold the Local Cooperation Agreement requirement.