**Abdon ACEVEDO et al., Plaintiffs,**

**v.**

**NASSAU COUNTY, NEW YORK, its officials, employees and agents, et al., Defendants.**

**No. 73 C 305.**

United States District Court, E. D. New York.

Jan. 30, 1974.

Richard F. Bellman, and Lois D. Thompson, Suburban Action Institute, Tarrytown, N. Y., for plaintiffs.

Joseph Jaspan, County Atty. of Nassau County, for Nassau County defendants.

John F. O'Shaughnessy, Town Atty., Hempstead, N. Y., by Albert Leone, for Town of Hempstead.

Edward J. Boyd, V, Acting U. S. Atty., E.D.N.Y., by Cyril Hyman, New York City, for defendant General Services Administration.

COSTANTINO, District Judge.

This suit is instituted pursuant to the *Civil Rights Act* (42 U.S.C. §§ 1981 et seq.), the Fair Housing Act of 1968 (42 U.S.C. §§ 3601 et seq.), and the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution. The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(3) and (4) (1971).

The action is being maintained on behalf of the class of all Blacks or Spanish-speaking persons residing or seeking to reside in the County of Nassau who are eligible for low-income housing as defined in state or federal statutes and regulations. Rule 23, Fed.R.Civ.P.

At issue is the future of approximately 685 acres of land located in Hempstead Township, Nassau County, New York. The tract of land, commonly known as Mitchel Field, was formerly a United States Air Force base and comprised 1,125.7 acres. In 1961 after the Air Force had terminated operations at the base the land was declared surplus to the needs of the Federal Government. There followed a series of sales by which various governmental agencies acquired parcels at the Field. The plaintiffs question the propriety of the proposed development of the parcels acquired by Nassau County (approximately 630 acres) and the General Services Administration (approximately 55 acres).

Except for 66.9 acres reserved for park lands, the County purchased its parcels for full value and holds them free of any restrictive covenants. It now proposes the following land uses for its holdings:

(1) an educational, cultural and civic center;

(2) commercial and light industrial buildings;

(3) recreational facilities;

(4) a convention center;

(5) a natural reserve (Hempstead Plains);

(6) a bus depot; and

(7) senior citizen housing.

The General Services Administration has publicized its desire to build a federal office building on its land.

It must be conceded that save for 250 units of senior citizen housing, the officials of Nassau County are avowedly opposed to the construction of any form of housing at Mitchel Field. The plaintiffs contend that the County's failure to provide for or plan for low-income housing at Mitchel Field is motivated by racial bias, an intent to cause, contribute to or perpetuate patterns of residential racial segregation; and that in any event the County's actions with respect to low-income housing at Mitchel Field will have the effect of perpetuating existing racial segregation in the County. Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968); Mahaley v. Cuyahoga Metropolitan Housing Authority, 355 F.Supp. 1245 (N.D.Ohio 1973); Banks v. Perk, 341 F.Supp. 1175 (N.D.Ohio 1972); Crow v. Brown, 332 F.Supp. 382 (N.D.Ga.1971); Kennedy Park Homes Association v. City of Lackawanna, 318 F.Supp. 669 (W.D.N.Y. 1970), aff'd, 436 F.2d 108 (2d Cir. 1972). Furthermore, the plaintiffs assert that the County's proposed construction at Mitchel Field of 250 units of senior citizen housing, which will be

almost exclusively occupied by whites, in light of its adamant refusal to include low-income housing there, which would be almost exclusively occupied by Blacks, is racially discriminatory—a violation of the equal protection clause of the Fourteenth Amendment. Hawkins v. Town of Shaw, 437 F.2d 1286 (5th Cir. 1971). Finally, plaintiffs charge that construction of a federal office building at Mitchel Field will constitute a violation of Executive Order 11512, 35 Fed.Reg. 3979 (March 3, 1970), and the Fair Housing Act of 1968 (42 U.S.C. § 3601 et seq.).

Plaintiffs seek declaratory and injunctive relief to insure that low-income housing on a non-discriminatory basis will be constructed at Mitchel Field.[1] Specifically they request an order requiring that:

(1) the County comprehensively plan for the development of Mitchel Field to include a significant amount of low and moderate income housing;

(2) the Town of Hempstead rezone land at Mitchel Field and promptly take whatever other steps are necessary in order to enable the housing uses proposed in said plan;

(3) the County and Town and whomever in addition to the County and Town may accept responsibility for development of housing proposed in said comprehensive plan, develop housing which is available to all persons regardless of race, national origin, ethnic background and economic status; and

(4) the defendants permit and encourage meaningful participation of plaintiffs, their attorneys and urban planners retained by them in the drafting and consideration of said comprehensive plan, and

that defendants submit said comprehensive plan to this court, for approval, within 90 days from the date of entry of this court's order herein.

Plaintiffs' Proposed Findings of Fact at 75. With regard to defendant General Services Administration the plaintiffs request that the court:

[D]eclare that GSA has violated the federal site selection laws and regulations by submitting a prospectus for a federal office building to OMB prior to ascertaining the availability of low and moderate income housing in the area and embarking on any and all necessary affirmative acts with regard to such housing;

and further that:

GSA should be enjoined from taking any further action towards the design or construction of a federal office building at Mitchel Field until the provisions of Executive Order 11512 have been met and adequate low income housing on a nondiscriminatory basis has been made available.

Plaintiffs' Proposed Findings of Fact at 78–79.

The threshold issue to be decided by the court is whether the alleged activities of Nassau County and the General Services Administration relating to their holdings at Mitchel Field result in racially discriminatory treatment. It is well settled that:

[A]ny municipal conduct which has the purpose or effect of discriminating against [Blacks] or perpetuating racial concentration or segregation in housing is violative of the civil rights of [Blacks] and a denial of equal protection, absent a showing by the municipality of a supervening and compelling necessity. . . . [G]iven a *prima facie* showing of discriminatory effect, the [municipality] must come forward with a superven-

---

1. On December 17, 1973, the court issued an order of preliminary injunction enjoining the defendants Nassau County and its officials from issuing any bonds or from authorizing capital expenditures for the construction of a recreation center or any other improvements or embellishments of Mitchel Field Park.

ing necessity or compelling interest to overcome a finding of discrimination. Mahaley v. Cuyahoga Metropolitan Housing Authority, *supra* 355 F.Supp. at 1264. Similarly, it has been held that:

> Since this nation is committed to a policy of balanced and dispersed public housing, low-income Blacks can no more be confined to a concentrated area than that they can be required to send their children to segregated schools. . . . Moreover, deprivation of equal housing rights caused to some extent by the neglect or thoughtlessness of local officials constitutes an equal protection violation.

Banks v. Perk, *supra* 341 F.Supp. at 1179.

■ Consequently, if a *prima facie* showing of racially discriminatory treatment is made the defendants will be required to justify their actions by establishing a legitimate and compelling governmental interest.

■■ Proof of racial discrimination may be established either by proof of purpose or effect, Reitman v. Mulkey, ·387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); good faith is not a defense, Hunter v. Erickson, 393 U.S. 385, 89 S. Ct. 557, 21 L.Ed.2d 616 (1969), and Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Official action which may appear neutral on its face, but has the inevitable effect of either tying present rights to the discriminatory patterns of the past or placing a special burden upon Blacks is unlawful. Gaston County v. United States, 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969); United States v. Louisiana, 380 U.S. 145, 85 S. Ct. 817, 13 L.Ed.2d 709 (1965). In Kennedy Park Homes Association v. City of Lackawanna, 318 F.Supp. 669 (W.D.N.Y. 1970), Judge Curtin appropriately described the court's task as follows:

> Judicial inquiry into the purpose or effect of governmental action is not limited to the moment that that action occurs. Not only must the "immediate objective" of governmental action be considered, but the "historical context" and "ultimate effect" of such action must be considered as well. . . . The inquiry must further assess the "reality" of the "law's impact" and consider the "background" against which state action operates to determine that reality. . . . Therefore, relevant to this inquiry are either past or prospective governmental actions which form a part of the background.

*Id.* at 694.

Nassau County is situated on Long Island and is bordered by the Borough of Queens, City of New York on the West and the County of Suffolk on the East. The County is politically subdivided into three townships, North Hempstead, Oyster Bay and Hempstead. Within the townships there are approximately 125 incorporated and unincorporated villages and two cities, the City of Glen Cove and the City of Long Beach.

In close proximity to New York City, Nassau County has experienced a great influx of people. In 1970 its population had grown to 1,428,838, and was near saturation. U.S. Census '70, Nassau-Suffolk Regional Planning Board, at 4 (October, 1971) [hereinafter referred to as *Bi-County Report*].

Because of its suburban character the County has become an attractive place to live. Most of its residents live in privately-owned single family housing. The County has the highest median income level and the lowest percent of overcrowded housing in the New York City metropolitan area. However, the recent growth of its population has caused severe strains on the County's resources. The County has an extremely low land vacancy rate. There are shortages in almost all areas of municipal services, i. e., mass transportation, recreation facilities, sewers, and water supply. The cost of home ownership has risen sharply and there is a definite need for multifamily housing to accommodate the aged, the young and the poor residing within the County.

The population of Nassau County is not equally distributed among the three townships. Although it comprises less than one-half of the land of the County, the Town of Hempstead has approximately two-thirds of the County's population, giving it a density of 6,447 people per square mile which is greatly in excess of the density of the other two townships. Concomitantly, the land available for new construction in the other townships is almost twenty times that which is available in the Town of Hempstead.

Blacks constitute approximately five percent of the population of Nassau County.[2] Their settlement, however, has become one of increasing concentration. Over four-fifths of the Blacks residing in the County live in thirteen out of the one hundred twenty five villages in the County. Eight of these villages are located in the Town of Hempstead, four are located in North Hempstead and one is located in Oyster Bay. Because of its low zoning requirements and high density over seventy percent of the Blacks living in Nassau reside in the Town of Hempstead.

Despite the recognized need and increased pressure for multifamily housing, the people of Nassau have zealously guarded the suburban character of their communities. Wary of increased urbanization, the residents of Nassau have voiced strong opposition to the construction of high density housing. Added to this problem is the fact that the Bi-County Planning Commission and other responsible planning organizations have

suggested that a corridor of high density housing should be maintained through the middle of Nassau. This corridor would include most of Hempstead Township which already has the highest density in the County.

With respect to the development of Mitchel Field, all the planners who appeared before the court agreed that its primary function should be to serve as an educational, cultural and civic center. Suggestions have also been made to construct commercial offices, light industrial buildings and recreational facilities at Mitchel Field.[3] Some have recommended that multifamily housing be constructed there.[4]

Everyone concerned with the development of Mitchel Field is in agreement that it should not provide solutions for county-wide problems. For this reason plans to construct a county seat there have been rejected. An overall planning objective for the development of Mitchel Field appears to be the creation of diverse activities, so as to create a "center of activity"; no one activity is to dominate. The housing suggested for Mitchel Field was to further these planning objectives, making Mitchel Field a viable center of activity.

As can be expected there have been conflicting views on the land uses that should be employed at Mitchel Field. Each view is of course influenced by personal interests, political persuasion and individual taste. Up to the present time no single plan has been adopted. It is certain, however, that save for a small amount of senior citizen housing, the

2. In 1970 the non-white population of Nassau was 5.1% (up from 3.2% in 1960). Between 1960 and 1970, non-whites constituted 23.6% of the County's population growth—the non-white population increased 66.9% while the white population increased by 7.8%. *Bi-County Report*, Vol. 2.

3. In 1966 while Eugene H. Nickerson was serving as County Executive, the County purchased approximately 153 acres of land in the Northwest quadrant of Mitchel Field for "industrial and recreational use."

4. In 1966 the Town of Hempstead initiated negotiations for the purchase of 191 acres in

the Northwest quadrant of Mitchel Field. The land was to be used for the construction of multifamily housing units, which would have provided among other things 500 units of low-income family housing. However, the land was eventually acquired by the County for other purposes.

Additionally, the Bi-County Planning Commission and other studies commissioned by the County have recommended the construction of high-rise apartment buildings at Mitchel Field. The housing proposed was to afford "a mix of housing opportunities," and was to include luxury, senior citizen and low-income family units.

County opposes the construction of housing at Mitchel Field.

Unquestionably the decision not to construct housing at Mitchel Field is in large part a result of public opposition. High-rise apartment buildings have been objectionable to the people of Nassau. They oppose the increased urbanization of their communities; they are opposed to any significant influx of children into their local school districts; and they are concerned about the increased demands for municipal services. Public housing has also been objected to because of the loss of revenue it causes and the increased burdens it places on the community's resources. By far, however, the most objectionable form of housing has been low-income family housing. It is clear from all the evidence that community opposition to this form of housing had been racially motivated.

In Nassau County low-income family housing is predominantly occupied by Blacks. Proposals for the construction of this form of housing have incurred immediate and vehement opposition. As can be expected such heated opposition has not been ignored by the elected officials of Nassau. There is evidence of more than one housing proposal being dropped because of vehement community opposition. Future proposals are sure to take into consideration the strong feelings of the residents of Nassau County.

The residents of Nassau County, however, are not on trial. In judging the actions of the public officials of Nassau, community reaction to low-income family housing—the racial fears and prejudices manifested—is only one of many relevant indicia. It is relevant to this cause of action only insofar as it is given effect through the conduct of the officials of Nassau County acting under color of state law. In view of all the evidence in this case the court finds that there is no proof of official conduct which has as its purpose the containment of Blacks or which has the effect of denying Blacks rights and opportunities available to whites. The record shows just the opposite.

Nassau County has an Open Housing Law, which according to the testimony of Kenneth R. Bedford, Regional Director of the Long Island Region National Association for the Advancement of Colored People, is actively enforced. The County Open Housing Law reads in pertinent part as follows:

In the County of Nassau, with its population consisting of people of various races, creeds, colors, and national origins, there is no greater danger to the health, morals, safety, and welfare of the County and its inhabitants than the existence of groups and individuals reflecting prejudice against one another and antagonistic to each other because of differences of race, creed, color, or national origin. Many persons have been compelled to live in circumscribed sections under substandard, unhealthful, unsanitary, and crowded living conditions because of discrimination and segregation in housing. . . . [A]cts of prejudice, intolerance, bigotry, and discrimination which deny a person the opportunity to sell, purchase, lease, rent, or obtain financing for the purchase or lease of housing accommodations because of race, creed, color, or national origin, threatens the fundamental rights and privileges of the inhabitants of the County of Nassau. . . . It shall be the duty of all County officers, officials and employees to exercise appropriate governmental functions relating to the use, sale, or occupancy of land, real property, or housing accommodations in such a manner consistent with law that all patterns of racially segregating housing existing in this County be eliminated and that the creation of any such patterns be prevented to the maximum extent that such a result can be achieved by such action.

With respect to low-income family housing the evidence adduced at trial evinces that the officials of Nassau have not disregarded the need that exists

within the County. Prior to January, 1973, when the Federal Government imposed a moratorium on all federally funded housing programs, attempts had been made to construct a substantial amount of low-income family housing in the County. The present County Executive, acting both in his capacity as County Executive and formerly as the Presiding Supervisor for the Town of Hempstead, supported several proposals to alleviate the housing needs of the poor. In 1961 Mr. Caso was instrumental in the Town's attempt to purchase land at Mitchel Field so that low-income housing could be constructed there. In 1972 Mr. Caso proposed a "scattered site housing plan" whereby the Town of Hempstead would have constructed multifamily housing units throughout the Town. The proposed housing would have provided a mix of housing opportunities—70% middle-income, 20% low-income and 10% senior citizen. Since taking office as County Executive Mr. Caso has appointed a County Housing Coordinator who is to function as a liaison with public and private housing groups to assist them in obtaining funds from private, federal and state sources. Additionally Mr. Caso openly supported a proposed amendment to the New York State Constitution which would have granted the County authority to build housing; the amendment was rejected by the voters. Finally, there is evidence that despite the Federal Government's moratorium on housing funds, low-income family housing is being constructed within Nassau County, under the auspices of local municipalities.

The court must now face the problem of determining the reality of the circumstances underlying Nassau County's refusal to build high-rise apartments at Mitchel Field.[5] Can it be said that the construction of high-rise apartments at Mitchel Field is necessary to dismantle

racially segregated patterns of residential housing? The evidence before the court does not disclose the existence of *fixed* patterns of home ownership in Nassau County. There are no physical boundaries separating whites from Blacks and there is considerable movement of Blacks into areas formerly occupied exclusively by whites. This is especially true of the Town of Hempstead where most of Nassau's Black population resides. Moreover, Mitchel Field is not outside of the areas of minority concentration. It borders on the Village of Hempstead, which has a high concentration of Blacks (one-third of its population is Black), and the Village of Uniondale which likewise has a significant Black population (eighteen percent of its population is Black). Additionally, Mitchel Field is in close proximity to other areas populated by significant numbers of Blacks and it is in an area which has the highest population density in the County. Finally, considering the availability of land throughout Nassau County that could be used to construct multifamily housing and the suburban character of the communities within the County there is no basis to support a finding that the construction of high-rise apartments at Mitchel Field is essential to the existence of low-income family housing in Nassau County.

■ The plaintiffs have failed to meet their burden of proof. The court finds that the preclusion of housing at Mitchel Field does not have a racially discriminatory purpose or effect. The court further finds that the land uses proposed for the development of Mitchel Field have a rational and legitimate governmental purpose, and that there is no invidious discrimination. Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L. Ed.2d 393 (1961); Boraas v. Village of

---

5. Plaintiffs' attorneys have stated that they do not advocate the construction of any specific type of housing at Mitchel Field. However, high-rise apartments are the only housing which would conform to the land

utilization proposed by all planners. Indeed all housing recommendations made by the planners referred solely to high-rise dwellings.

Belle Terre, 476 F.2d 806 (2d Cir. 1973); see also Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972); James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971). Finally, with regard to the proposed construction of 250 units of senior citizen housing at Mitchel Field, what is conceded to be a "token amount," the court finds in light of all the evidence in this case that such actions are not the result of intentional and purposeful racial discrimination.

With respect to defendant General Services Administration the plaintiffs have also failed to sustain their burden of proof. The charges made against G. S.A. are without merit; rather the evidence discloses that G.S.A. is complying with the Federal Site Selection laws. Brookhaven Housing Coalition v. Kunzig, 341 F.Supp. 1026 (E.D.N.Y.1972).

The foregoing opinion shall constitute the court's findings of fact and conclusions of law, as required by Fed.R.Civ.P. 52(a).

Accordingly, the action is dismissed.